**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

GARRICK HARRINGTON,
*Plaintiff-Appellant*,

v.

A. K. SCRIBNER; M. E. POULOS;
YAMAMOTO -; R. R. LOWDEN; L. L.
WOODS; FURHOLDT; D. HICKS,
*Defendants-Appellees*.

No. 09-16951

D.C. No.
1:05-cv-00624-
OWW-GSA

OPINION

Appeal from the United States District Court
for the Eastern District of California
Oliver W. Wanger, Senior District Judge, Presiding

Argued and Submitted
October 6, 2014—San Francisco, California

Filed May 7, 2015

Before: Sidney R. Thomas, Chief Judge, and Diarmuid F.
O'Scannlain, and M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown;
Partial Concurrence and Partial Dissent by
Judge O'Scannlain

## SUMMARY[*]

### Prisoner Civil Rights

The panel affirmed in part and reversed in part the district court's judgment, entered following a jury trial, in an action arising from a lockdown imposed on African American inmates at a California state prison.

Plaintiff, a Californian state prisoner, brought claims under the Eighth Amendment for injuries he suffered related to shower restrictions and under the Equal Protection Clause of the Fourteenth Amendment for the race-based classification of the lockdown.

Affirming with respect to the Eighth Amendment deliberate indifference to inmate safety claim, the panel held that the district court's jury instruction on that claim essentially correctly restated the elements of the test outlined in *Farmer v. Brennan*, 511 U.S. 825 (1994), by requiring knowledge of a "substantial risk of serious harm" and that a defendant "disregarded that risk."  The panel held that plaintiff was not entitled to urge liability based on defendants' constructive knowledge of the risk.

Reversing with respect to the equal protection claim, the panel held that the district court's jury instructions were inconsistent with the requirements of strict scrutiny.  The panel held that the district court erred when it instructed the jury that a prison's obligations under the Eighth Amendment

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

compete with its obligations under the Equal Protection Clause of the Fourteenth Amendment. That error, which absolved the prison officials of their obligation to demonstrate that the race-based action was narrowly tailored, violated the tenets of *Johnson v. California*, 543 U.S. 499 (2005)*,* and was prejudicial.

The panel held that the district court did not abuse its discretion by denying plaintiff appointed counsel.

Concurring in part and dissenting in part, Judge O'Scannlain concurred in the panel's analysis of plaintiff's deliberate indifference and appointment of counsel claims and joined in the opinion and judgment to that extent. Judge O'Scannlain dissented from the panel's equal protection analysis and concluded that the relevant jury instruction appropriately incorporated deference to prison officials' unique expertise.

---

## COUNSEL

Allison B. Holcombe (argued), Abraham A. Tabaie (argued), and Carol Alé, Los Angeles, California, for Plaintiff-Appellant.

Jose Zelidon-Zepeda (argued), Deputy State Attorney General; Kamala D. Harris, Attorney General of California; Jonathan L. Wolff, Senior Assistant Attorney General; Thomas S. Patterson, Supervising Deputy Attorney General, San Francisco, California, for Defendants-Appellees.

---

## OPINION

McKEOWN, Circuit Judge:

This case arises from a lockdown imposed on African American inmates at a California state prison after violent incidents involving inmates and guards. Garrick Harrington brought suit against prison officials under the Eighth Amendment for injuries he suffered related to shower restrictions and under the Equal Protection Clause of the Fourteenth Amendment for the race-based classification of the lockdown. A jury found against him on both claims.

We consider the interplay between the Supreme Court's teaching in *Johnson v. California*, 543 U.S. 499 (2005), that strict scrutiny applies to claims challenging racial classifications in prison, and the line of authorities, such as *Turner v. Safley*, 482 U.S. 78 (1987), that instruct courts to give deference to correctional officials with respect to constitutional claims involving prison regulations. We affirm the judgment with respect to the Eighth Amendment deliberate indifference claim. We reverse with respect to the equal protection claim because the jury instructions were inconsistent with the requirements of strict scrutiny. That error, which absolved the prison officials of their obligation to demonstrate that the race-based action was narrowly tailored, violated the tenets of *Johnson* and was prejudicial.

## BACKGROUND

Early 2004 was a violent period at California State Prison–Corcoran. In February and March, multiple violent incidents occurred, each involving African American inmates associated with gangs. Five more violent incidents occurred

over the next two months, including riots involving white inmates and inmates associated with certain "disruptive groups," which are groups of individuals who have formed an alliance and act, often aggressively, at the direction of a leader. Prison officials also reported receiving information of a statewide risk that unidentified African American inmates would attack prison staff.

In response, the prison instituted a lockdown on African American inmates due "to multiple batteries on staff by Blacks . . . coupled with information indicating a coalition of Black inmates are plotting the murder of staff," as was explained in a Program Status Report, a weekly memorandum issued during periods of modified programming. That lockdown was followed by a state of emergency lockdown applicable to inmates of all races. As part of the emergency action, the prison instituted shower restrictions that, among other things, allowed inmates to wear only minimal clothing—boxer shorts and shower shoes—and required them to be handcuffed while being escorted to the shower. Eventually, the shower restrictions were lifted for all inmates except African American inmates, including Garrick Harrington, and members of the Northern Hispanic disruptive group. An updated Program Status Report explained that, amongst other things, "batteries on staff by various factions of black inmates" were an "ongoing state-wide concern indicating a mindset by this ethnic group to harm staff." Over time, the shower restrictions were eased for additional groups, including older African American inmates. The state of emergency ended, and the prison gradually lifted the lockdown restrictions and returned to normal programming.

While the race-based shower restrictions were still in place, Harrington—who was not involved in the violent

altercations that led to the lockdown and was not associated with a gang or disruptive group—requested that he be permitted to walk to the showers wearing his government-issued boots instead of the shower slippers, which he described as "flimsy." A correctional officer denied his request, then escorted Harrington, who was handcuffed and wearing shower slippers, to a shower on another floor, all the while following behind without assisting him. Harrington came upon a pool of water and testified that he heard a correctional officer say, "It's slippery there." Harrington slipped in the water, fell, and injured his back. Despite treatments, his pain continues, requiring medication.

Harrington filed this suit under 42 U.S.C. § 1983 against several prison officials, alleging claims for deliberate indifference in violation of the Eighth Amendment and for race discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. His repeated requests for the appointment of counsel were denied, an issue he raises again on appeal. The case proceeded to trial, where the jury found for the prison officials. Harrington challenges the verdict on the grounds that the jury was improperly instructed on both of his constitutional claims.

## ANALYSIS

## I.     EIGHTH AMENDMENT CLAIM

The Eighth Amendment claim centers on the jury instructions on deliberate indifference. The court instructed the jury that "[t]o establish deliberate indifference, the plaintiff must prove that a defendant knew that the plaintiff faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to correct it."

Before trial, Harrington proposed an additional "knowledge" instruction that the court declined to give to the jury. After the close of evidence, the court reviewed the proposed jury instructions with the parties and gave them time to independently review the instructions. Upon reconvening, the court asked whether Harrington had any "corrections, additions, deletions, modifications or objections." Harrington offered one change, unrelated to the deliberate indifference standard.

During jury deliberations, the jury submitted two questions to the court: "What is serious risk of injury? Please define. Is the fact that the areas around all the showers are always wet constituting [sic] a serious risk of injury?" Outside the presence of the jury, the court discussed several cases in detail with the parties and concluded that none of the cases defined "serious risk" (or, as the original instruction had put it, "substantial risk") in the context of an Eighth Amendment claim. Harrington then noted that caselaw supports the notion that "knowledge can be demonstrated of the substantial risk simply because it was obvious"; counsel for the defendants pointed out in response that the jury's inquiry did not pertain to knowledge. Upon the jury's return, the court gave supplemental instructions that the jury was "to determine whether any defendant acted with deliberate indifference to a known risk," and that "[k]nown risk means that the person who has the duty to protect from it has to have knowledge that there is a known hazard or known danger of serious harm."

In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court outlined the standard for Eighth Amendment liability for acting with "deliberate indifference" to inmate safety. At the outset, the Court rejected the "invitation to adopt an

objective test for deliberate indifference." *Id.* at 837. To prove deliberate indifference, subjective recklessness is required, that is, an official "cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* Constructive notice does not suffice to prove the requisite knowledge, but "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 841–42.

The court's original Eighth Amendment instruction essentially restates the elements of the *Farmer* test by requiring knowledge of a "substantial risk of serious harm" and that a defendant "disregarded that risk." The instruction does not mention that such knowledge may be established by circumstantial evidence, as did Harrington's additional proposed instruction. But the jury was not totally without guidance on this point. The court gave a general instruction on the definitions of circumstantial evidence and direct evidence and stated, "You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence." The court put no restrictions on Harrington's ability to argue that circumstantial evidence supported his claim. Harrington was not entitled, as he argues here, to urge liability based on constructive knowledge of the risk, a theory of liability the Supreme Court explicitly rejected in *Farmer*. *Id.* at 841.

The supplemental instructions delivered after the jury's questions about the meaning of "serious risk of injury" did not introduce error. According to Harrington, the supplemental instructions over-emphasized subjective knowledge, thereby impermissibly "heightening" the knowledge requirement. This argument is unpersuasive, as *Farmer* clearly requires subjective knowledge. *Id.* at 837. The instruction stated that requirement correctly, and the court did not abuse its discretion in repeating the standard in response to the jury's question. *See Jazzabi v. Allstate Ins. Co.*, 278 F.3d 979, 982 (9th Cir. 2002) (holding that we review the court's decision whether to give a supplemental jury instruction, and the formulation of that instruction, for abuse of discretion).

Harrington's argument misapprehends the significance of the obviousness of a risk in a deliberate indifference calculus. Our cases support the proposition that obviousness of a risk may be used to prove subjective knowledge, not that liability may be based on constructive knowledge. *See Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013) (requiring a plaintiff to demonstrate "that the risk was obvious or provide other circumstantial or direct evidence that the prison officials were aware of the substantial risk" to defeat summary judgment); *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (noting that subjective awareness "may be satisfied if the inmate shows that the risk posed by the deprivation is obvious"). Although evidence of obviousness may present a disputed fact to defeat summary judgment, such evidence cannot be used to circumvent the need for a jury instruction on *Farmer*'s subjective knowledge requirement once a case reaches a jury.

## II. EQUAL PROTECTION CLAIM

The fundamental principle that prisoners are protected from race discrimination is longstanding:  "Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (citing *Lee v. Washington*, 390 U.S. 333 (1968) (per curiam)).  In *Johnson*, the Supreme Court was unequivocal that strict scrutiny is the proper standard of review for an equal protection challenge to a race-based prison policy.  543 U.S. at 515.  Similarly well established is the role that deference to prison officials plays in prison administration.  *Turner*, 482 U.S. at 89; *see generally Norwood v. Vance*, 591 F.3d 1062 (9th Cir. 2010) (emphasizing importance of deference instruction in Eighth Amendment claim).  The question we consider in this § 1983 case, in the context of the jury instructions on equal protection, is the relationship between these principles when race classifications collide with prison security concerns.

### A. JURY INSTRUCTIONS

The court gave a trio of instructions related to Harrington's equal protection claim.  It began with an instruction on "Prisoner's Claim Regarding Denial of Equal Protection":

> Prisoners are protected from racial discrimination by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  On his equal protection claim, the plaintiff must prove by a preponderance of the evidence that defendants . . . acted with an intent or purpose

to discriminate against the plaintiff, or against a class of which the plaintiff is a member, based on his race.

Intentional discrimination means that a defendant acted at least in part because of the plaintiff's race.

The court then instructed the jury that "[t]he state may take race-based action when necessary to further a compelling governmental interest," if the action is "narrowly tailored to serve such a governmental interest." The court followed that instruction by telling the jury that "[i]n considering whether [the defendants] discriminated against plaintiff because of his race, you should consider that defendants had a competing obligation under the Eighth Amendment to ensure the safety of prisoners, including protecting prisoners from each other and/or maintaining institutional security. In considering these factors, you should respect and give deference to the opinion of prison officials in their adoption and execution of policies and practices that in their judgment are needed to preserve discipline and to maintain internal security in a prison."

Harrington challenges the latter instruction, which at trial was denominated as "the *Norwood* instruction."[1] He argues that its effect was to lessen the scrutiny that the jury applied to the equal protection claim. Harrington's proposed strict scrutiny instructions did not mention or carve out deference.

---

[1] In *Norwood*, which involved a claimed Eighth Amendment violation for denial of outdoor exercise, the court endorsed an almost identical deference instruction. 591 F.3d at 1066.

After the court reviewed the *Norwood* instruction with the parties and solicited their views, Harrington told the court that he was "unclear" on this instruction because "that wasn't the strict scrutiny instruction." Through his proposed strict scrutiny instruction plus his response to the court on the *Norwood* instruction, the court was on notice as to Harrington's position. Harrington did not waive this error. We review de novo whether the instruction misstates the law. If so, the error warrants reversal, unless it is harmless. *Dang v. Cross*, 422 F.3d 800, 804–05 (9th Cir. 2005).

### B. *JOHNSON V. CALIFORNIA*, RACIAL CLASSIFICATIONS AND NARROW TAILORING

The Supreme Court has recognized that "racial classifications 'threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility.'" *Johnson*, 543 U.S. at 507 (quoting *Shaw v. Reno*, 509 U.S. 630, 643 (1993)) (emphasis omitted). Consequently, racial classifications in prisons are "immediately suspect" and subject to strict scrutiny, which requires the government to prove that the measures are narrowly tailored to further a compelling government interest. *Id.* at 509 (quoting *Shaw*, 509 U.S. at 642).

*Johnson* arose in the context of a California Department of Corrections "unwritten policy of racially segregating prisoners" each time they entered a new correctional facility. *Id.* at 502. Like the lockdown and restrictions imposed here, the CDC attempted to justify the practice "to prevent violence caused by racial gangs." *Id.*

In reaffirming the strict scrutiny standard, the Court reviewed its past cases, such as *Lee v. Washington*, 390 U.S.

333 (1968) (per curiam), applying heightened review "in evaluating racial segregation in prisons." *Johnson*, 543 U.S. at 506–07.  It emphasized that "strict scrutiny is no less important" where "prison officials cite racial violence as the reason for their policy."  *Id.* at 507.

Significant to our case, the prison officials in *Johnson* alleged that their judgments were entitled to the same deference as the defendants in *Turner*.  *Id.* at 509.  The Court rebuffed this effort, noting that *Turner* did not involve a race-based classification and had never been applied to racial classifications.  The reason is that "[t]he right not to be discriminated against based on one's race is not susceptible to the logic of *Turner*.  It is not a right that need necessarily be compromised for the sake of proper prison administration."  *Id.* at 510.

The Court went on to confirm its implicit holding in *Lee*: "The 'necessities of prison security and discipline,' are a compelling government interest justifying only those uses of race that are narrowly tailored to address those necessities." *Johnson*, 543 U.S. at 512 (citation omitted) (quoting *Lee,* 390 U.S. at 334).  The bottom line is that prison security and deference to prison authorities do not trump *Johnson*'s narrow tailoring requirement.

We have not addressed previously the relationship between strict scrutiny in a race discrimination equal protection claim and the principle of deference to prison officials that originated in cases involving Eighth Amendment claims.  In *Norwood*, we established that "[p]rison officials are entitled to deference whether a prisoner challenges excessive force or conditions of confinement." 591 F.3d at 1067.  In *Norwood*, however, only Eighth

Amendment claims were before the court. Tellingly, we "express[ed] no view as to the race-based aspect of the lockdowns" that were challenged, nor did we take a position on "any potential Equal Protection claim." *Id.* at 1066 n.1. This case requires us to consider precisely the questions left unanswered in *Norwood*. We now conclude that even where deference is owed to prison officials as to one claim in a suit, such as an Eighth Amendment claim, the strict scrutiny analysis of an equal protection claim does not indiscriminately incorporate that deference. Nor do the claims compete.

This approach is in keeping with the Supreme Court's observations on the more deferential test that Justice Thomas would have applied in *Johnson*: "Justice Thomas takes a hands-off approach to racial classifications in prisons, suggesting that a 'compelling showing [is] needed to overcome the deference we owe to prison administrators.' But such deference is fundamentally at odds with our equal protection jurisprudence. We put the burden on state actors to demonstrate that their race-based policies are justified." 543 U.S. at 506 n.1 (citation omitted).

The district court accurately instructed the jury on the elements of race discrimination and strict scrutiny. The jury was told that the race-based action could be justified if it was narrowly tailored to serve a compelling government interest. So far, so good. But the follow-on instruction on deference, which was specifically pegged to the race claim, basically pulled the rug out from under the narrow tailoring requirement. The instruction pitched the two claims as competing against one another—"[i]n considering whether defendants . . . discriminated against [Harrington] because of his race, you should consider that defendants had a competing

obligation under the Eighth Amendment to ensure the safety of prisoners . . . ." It thus suggested that Harrington's success on the equal protection claim was in some way dependent on the defendants' loss on the Eighth Amendment claim. Then the instruction took an even more devastating blow to the narrow tailoring requirement by enshrining the "policies and practices" of prison officials with broad deference rather than putting the specific practices challenged here to the test of narrow tailoring. In doing so, the court diluted the requirements of strict scrutiny by introducing the notion that the standard governing a race discrimination claim is in equipoise with the deference owed to prison officials in an Eighth Amendment context, even though the analysis for each type of claim differs.

We conclude that the court erred when it instructed the jury that the prison's obligations under the Eighth Amendment compete with its obligations under the Equal Protection Clause of the Fourteenth Amendment. A prisoner's success on an equal protection claim is not dependent on whether the government met its obligations under the Eighth Amendment. In light of *Johnson*'s clear direction, the court also erred by allowing the jury to defer generally to officials when considering Harrington's equal protection claim, rather than assessing whether the challenged race-based actions were narrowly tailored.

Our analysis should not be read to mean that deference plays no role in prisoners' constitutional claims. Writing with respect to First Amendment and right to marry regulations in the prison context, the Supreme Court in *Turner* explained: "Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems

and to adopt innovative solutions to the intractable problems of prison administration." 482 U.S. at 89. In a recent Fourth Amendment case, the Court "confirmed the importance of deference to correctional officials" in the context of maintaining security and discipline in the jail. *Florence v. Bd. of Chosen Freeholders*, 132 S. Ct. 1510, 1515–16 (2012) (citing *Turner*, 482 U.S. at 89). Likewise, in the *Norwood* challenge to prison conditions relating to lockdowns and outdoor exercise, we reiterated the importance of deference. 591 F.3d at 1067.

But none of these cases involved claims governed by strict scrutiny, which allows deference a limited role. *See Johnson*, 543 U.S. at 509, 513 (rejecting the more deferential *Turner* test as "too lenient a standard to ferret out invidious uses of race"). In *Grutter v. Bollinger*, 539 U.S. 306 (2003), *superseded on other grounds by* Mich. Const. art I, § 26, deference played a role in assessing whether the government's asserted interest was compelling, but not whether its actions were narrowly tailored to serve that interest. The Supreme Court deferred to the University of Michigan Law School's expert "educational judgment that [attaining a diverse student body] is essential to its educational mission," and thus was a compelling interest. *Id.* at 328–29. Such an interest could justify the law school's use of race in admissions only if the means chosen to further that interest were "specifically and narrowly framed to accomplish that purpose." *Id.* at 333 (quoting *Shaw v. Hunt*, 517 U.S. 899, 908 (1996)). Deference played no role in the Court's assessment of whether the law school's use of race was narrowly tailored. *Id.* at 333–43; *see also Fisher v. Univ. of Tex. at Austin*, 133 S. Ct. 2411, 2419–20 (2013) ("The [government] must prove that the means chosen . . . are narrowly tailored to that goal. On this point, the University

receives no deference."). The jury instructions here did not differentiate how deference could properly inform the jury's consideration of the differing constitutional claims.[2]

Finally, we emphasize that penological interests may still factor into the analysis of an equal protection claim. "The 'necessities of prison security and discipline,' are a compelling government interest justifying only those uses of race that are narrowly tailored to address those necessities." *Johnson*, 543 U.S. at 512 (citation omitted) (quoting *Lee*, 390 U.S. at 334). Such interests properly inform whether there exists a compelling interest, but they do not excuse the narrow tailoring requirement.

## C. PREJUDICE

Although we review the instructions as a whole, the instructions here cannot be harmonized because the deference instruction circles back to whether the prison discriminated against Harrington because of his race. Although one instruction recites strict scrutiny, the deference instruction introduces a new and different standard. Taken together, the overall effect of the instructions was misleading. *See Dang*, 422 F.3d at 804 (stressing that instructions "must not be misleading"). The evidence was never put to the correct

---

[2] In *Cutter v. Wilkinson*, 544 U.S. 709 (2005), the Supreme Court analyzed statutory rights under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1(a)(1)–(2). The Court relied on legislative history to determine Congress's intended role for deference in assessing whether a burden to a prisoner's religious exercise furthers a "compelling governmental interest" by the "least restrictive means." *Cutter*, 544 U.S. 709, 717, 722–23 (2005). As a statutory case, *Cutter* does not inform our analysis of the constitutional claim presented here.

"narrow tailoring" test because the jury was told it should defer to the judgment of prison officials on this score.

The prison officials argue that any claimed instructional error is harmless because the verdict form reflects that Harrington failed to establish that there was any racial classification at all.  This circular response simply skirts the issue.  The jury answered no to the following question: "On Plaintiff's equal protection claim, did any Defendant intentionally discriminate against Plaintiff on account of his race in violation of the Equal Protection Clause."  If the answer was no, the defendants argue, then that was the end of Harrington's equal protection claim.  But the jury gave this answer after having been instructed that the strict scrutiny standard governing whether the defendants acted "in violation of the Equal Protection Clause" could give way to the lesser deference standard in evaluating the race claim.  The flaw in the instructions thus skewed how the jury would have understood the verdict form.  The error is prejudicial.  *See Wilkerson v. Wheeler*, 772 F.3d 834, 838 (9th Cir. 2014) (requiring for an error to be harmless that it be "more probable than not that the jury would have reached the same verdict had it been properly instructed").[3]

## III.   DENIAL OF COUNSEL

It is well established that "[t]he decision to appoint counsel in a civil suit is one of discretion and a district court's determination will be overturned only for abuse of that discretion."  *Cano v. Taylor*, 739 F.3d 1214, 1218 (9th Cir.

---

[3] It is unnecessary to determine whether, as Harrington argues, the "reasonableness" defense on the verdict form constitutes reversible error in light of our determination that the jury instructions were infirm.

2014) (citing *Palmer v. Valdez*, 560 F.3d 965, 970 (9th Cir. 2009)). The court must consider whether there is a "likelihood of success on the merits" and whether "the prisoner is unable to articulate his claims in light of the complexity of the legal issues involved." *Id.* Harrington's claims were relatively straightforward equal protection and deliberate indifference claims. Despite his medical issues, he articulated his claims well. He filed a pretrial statement, motions, proposed jury instructions, and other substantive documents, and engaged with opposing counsel and the court throughout years of legal proceedings. Although there were some tricky legal issues regarding the instructions, Harrington spotted the key jury instruction issue that is the subject of this opinion. Harrington served as the lead law library clerk in prison, and the court commended him at trial for presenting his case well. The court did not abuse its discretion by denying him appointed counsel.

**AFFIRMED** as to Harrington's Eighth Amendment deliberate indifference claim and the district court's decision not to appoint counsel. **REVERSED, VACATED** and **REMANDED** as to Harrington's equal protection claim. Each party shall bear its own costs on appeal.

---

O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part:

I concur in the Court's analysis of Harrington's deliberate indifference and appointment of counsel claims and join in the opinion and judgment to that extent. I must respectfully dissent, however, from the Court's equal protection analysis

and conclude that the relevant jury instruction appropriately incorporated deference to prison officials' unique expertise.

I

In *Johnson v. California*, 543 U.S. 499 (2005), the Supreme Court overturned a Ninth Circuit decision which had expressly rejected the strict scrutiny standard for equal protection claims against prison officials in favor of what the Supreme Court referred to as the "deferential" *Turner* standard, which asks whether the regulation was "'reasonably related' to 'legitimate penological interests.'" *Id.* at 504, 510 (quoting *Tuner v. Safley*, 482 U.S. 78, 89 (1987)). As the *Johnson* Court emphasized throughout its opinion, the two standards are fundamentally incompatible—the *Turner* standard requires merely a *reasonable* relationship to *legitimate* interests, while strict scrutiny requires "*narrow*[] *tailor*[*ing*]" to a "*compelling*" interest. *Id.* at 505 (emphasis added). Thus, *Johnson* established that when evaluating equal protection claims against prison officials, strict, rather than intermediate, scrutiny is the applicable test.

Our decision in *Norwood v. Vance*, 591 F.3d 1062 (9th Cir. 2010), does not address—and thereby does not alter—the appropriate tier of scrutiny to apply when analyzing Eighth Amendment or equal protection claims. Rather, we instructed that "[p]rison officials are entitled to deference whether a prisoner challenges excessive force *or conditions of confinement*." *Id.* at 1067 (emphasis added).[1]

---

[1] The majority is correct in its observation that *Norwood* specifically addressed only Eighth Amendment deliberate indifference claims. Maj. Op. at 13–14. The clear language of the opinion, however, describes the application of deference in terms of the type of activity challenged, rather

Here, as the majority acknowledges, the trial court accurately instructed the jury to apply a strict scrutiny analysis to Harrington's equal protection claim. Maj. Op. at 14. The trial court then, as required by *Norwood*, instructed the jury that prison officials are entitled to deference in their evaluation and adoption of prison policies necessary to maintain prison security and discipline—the very goals identified in *Johnson* as compelling interests that might justify race-based prison policies. 543 U.S. at 512.

According to the majority, this second instruction "pulled the rug out from under the narrow tailoring requirement" by suggesting that Harrington's equal protection claim was "competing" with the prison officials' defense on the Eighth Amendment claim. Maj. Op. at 14–15. Such a conclusion, however, rests on the premise that deference to state officials is necessarily incompatible with strict scrutiny analysis. *See* Maj. Op. at 17 ("Although one instruction recites strict scrutiny, the deference instruction introduces a new and different standard."). But the instruction's reference to "competing obligation[s]" simply reflects the reality that prison officials are forced to balance conflicting considerations—such as individual prisoner safety and the safety and security of the prison as a whole—when crafting prison policies.

Indeed, the Supreme Court has squarely rejected the view that deference and strict scrutiny are incompatible,

---

than the alleged right violated, and thereby indicates that deference should be afforded any time challenges are made regarding excessive force or confinement conditions, regardless of whether the challenge alleges deliberate indifference or an equal protection violation. As Harrington challenges his conditions of confinement, *Norwood*, by its terms, applies.

particularly in situations in which a certain group of state officials is likely to have specialized knowledge. For instance, in *Cutter v. Wilkinson*, 544 U.S. 709 (2005), the Court analyzed a claim under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1(a)(1)–(2), which prohibits the government from imposing a substantial burden on prisoners' religious exercise unless the burden furthers a "compelling governmental interest" by "the least restrictive means"—the same strict scrutiny test applied in the equal protection context. *Id.* at 712. In conducting its strict scrutiny analysis, the Court explained that it was appropriate to defer to prison officials' expertise when engaging in such strict scrutiny analysis. *Id.* at 722–23, 725 n.13.

Similarly, in *Grutter v. Bollinger*, 539 U.S. 306 (2003), *superseded on other grounds by* Mich. Const. art I, § 26, the Court deferred to law school officials when evaluating whether the school's race-based admissions policy withstood the scrutiny analysis required for equal protection claims. *Id.* at 327–28. Specifically, the Court deferred to the officials' unique ability to determine whether diversity was essential to the law school's educational mission and thereby qualified as a compelling state interest. *Id.* Thus, the Supreme Court has made clear that strict scrutiny and deference to state officials are by no means incompatible, even in the equal protection context.

The majority accurately quotes the crucial passage from *Johnson* that rejects the *Turner* standard of review because "such deference is fundamentally at odds with our equal protection jurisprudence." *See* Maj. Op. at 14 (quoting *Johnson*, 543 U.S. at 506 n.1). But the passage must be read in light of the opinion as a whole. In *Johnson*, the Court

rejected a lenient standard of review that fails to put the burden on state officials to articulate a compelling reason for engaging in race-based action—a standard that is *necessarily* incompatible with strict scrutiny. Viewed in such context, the passage simply identifies the inherent conflict between the *Turner* standard and the strict scrutiny standard. Here, however, there is no such inherent conflict in applying deference within the strict scrutiny framework.

Rather, such a strict scrutiny standard *can*, and indeed, under *Norwood*, *must*, accommodate a different form of deference—one that acknowledges the expertise of prison officials in crafting policies to promote prison safety and discipline.

## II

Because the trial court's jury instructions accurately integrate such deference into the strict scrutiny analysis required by *Johnson*, I would affirm the jury's verdict rejecting Harrington's equal protection claim and would affirm the judgment in its entirety.