**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOSE ABEL FIERRO,
*Plaintiff-Appellant*,

v.

KEITH SMITH, Security Operations
Administrator at Phoenix Division
Director's Office; MARLENE
COFFEY; PRUETT, D.W.; L.
FORESTER, D.W.; ROSE SANDERS;
PANANN DAYS; RYAN W. BROWER,
P.A.; NASH; ZORAN VUKCEVIC,
        *Defendants-Appellees*,

and

CHARLES L. RYAN; GREG FIZER,
Deputy Warden at Florence Central
Unit; JULI JACKSON; PHILLIS
WIGGIN, Correctional Officer (C.O.)
IV / Classification Administrator at
Florence Complex; M. ESPINOZA,
C.O. IV/ Grievance Coordinator at
Central Unit - Florence; S.
ANDERSON, C.O. IV/ Grievance
Coordinator at Central Unit -
Florence; M. STEPHAN, #2360/ C.O.
III at Central Unit - Florence;
THOMAS CHARLES HORNE, Attorney

No. 19-16786

D.C. No.
2:13-cv-02173-
JJT

OPINION

General; MICHAEL THOMPSON, Medical Doctor at Central Unit - Florence; GHETTS, Nursing Supervisor at Central Unit - Florence Complex; ETTA THURMAN, Medical Records Librarian/ Custodian at Central Unit - Florence; RICHARD PRATT, Director, Division of Health Services; BADILLA, # 4389/ C.O. III; MICHAEL MCCARVILLE, Deputy Warden/ Rast Unit – Lewis Complex; HOUZE, C.O. II; MOLERA, C.O. II; PIOTROWSKY, Sergeant; M. BARRERA, Grievance Coordinator/ C.O. IV; STACEY CRABTREE; CAREY TUCKER, Physician Assistant; MORALES, Nursing Supervisor; THEODORE, G.C./ C.O. IV; B. RAJAS, Facility Health Administrator/ Corizon; MERCHANT, Medical Doctor; CENTRAL OFFICE PAIN MANAGEMENT COMMITTEE, including Doe defendants 1–4; STARK, C.O. III; MILLER, N.S. Medical; ELSIE STOWELL, F.H.A. Corizon; GENE GREELEY, F.H.A.; M. THOMPSON, M.D.; J. MATTOS, G.C./ C.O. IV; M. HARVEY, F.H.A.; LUNDBERG, D.W.; ZORAN VUKCOVIC; EAST; QUINTERO; LUEN; MALACHINSKI; RIOOCHI; SHRUFF; BROWN; LACRONE; SHUSTER; B. OCHOA, Deputy Warden,

*Defendants*.

Appeal from the United States District Court
for the District of Arizona
John Joseph Tuchi, District Judge, Presiding

Argued and Submitted January 13, 2022
Pasadena, California

Filed July 5, 2022

Before:  J. Clifford Wallace and Michelle T. Friedland,
Circuit Judges, and Robert S. Lasnik,[*] District Judge.

Opinion by Judge Friedland

## SUMMARY[**]

### Prisoner Civil Rights

The panel vacated the district court's judgment entered following a jury verdict in favor of prison officials in an action brought pursuant to 42 U.S.C. § 1983 alleging that defendants failed to protect plaintiff from violence by other prisoners.

Between 2011 and 2013, plaintiff made six requests to be placed into protective custody, insisting that he was at risk of harm because he had received threats from the Border

---

[*] The Honorable Robert S. Lasnik, United States District Judge for the Western District of Washington, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Brothers, a gang active throughout Arizona's prisons. All six times, defendants denied plaintiff's requests for protective custody. After his sixth request was denied, plaintiff was physically assaulted in the prison yard by two other prisoners, at least one of whom was a suspected member of the Border Brothers. Plaintiff brought suit and after a four-day trial, the district court instructed the jury to "give deference to prison officials in the adoption and execution of policies and practices that, in their judgment, are needed to preserve discipline and to maintain internal security in a prison."

The panel held that because the evidence at trial reflected a genuine dispute whether the decisions to deny plaintiff's requests for protective custody were made pursuant to a security-based policy, and, if so, whether the decisions were an unnecessary, unjustified, or exaggerated response to security concerns, the district court's deference instruction was erroneous. That error may have affected the verdict. Accordingly, the panel vacated and remanded for a new trial. The panel addressed plaintiff's challenges to the district court's pretrial decisions in a concurrently filed memorandum disposition.

**COUNSEL**

Jeremy Girton (argued), Meaghan VerGow, and Rachel A. Chung, O'Melveny & Myers LLP, Washington, D.C.; Craig McAllister, O'Melveny & Myers LLP, New York, New York; Melissa C. Cassell, O'Melveny & Myers LLP, San Francisco, California; for Plaintiff-Appellant.

Joseph E. Dylo (argued), Assistant Attorney General; Mark Brnovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for State Defendants-Appellees.

Patrick Nish Arndt (argued), Nall & Miller LLP, Atlanta, Georgia; J. Scott Conlon, Renaud Cook Drury Mesaros PA, Phoenix, Arizona; for Defendants-Appellees Ryan W. Brower and Zoran Vukcevic.

**OPINION**

FRIEDLAND, Circuit Judge:

Jose Abel Fierro, a prisoner in his sixties with numerous chronic health conditions, appeals from a judgment following an adverse jury verdict on his claim that six employees of the Arizona Department of Corrections (collectively, "Defendants") violated the Eighth Amendment by failing to protect him from violence by other prisoners. Between 2011 and 2013, Fierro made six requests to be placed into protective custody, insisting that he was at risk of harm because he had received threats from the Border Brothers, a gang active throughout Arizona's prisons. All six times, Defendants denied Fierro's requests for protective custody. After his sixth request was denied, Fierro was physically assaulted in the prison yard by two other

prisoners, at least one of whom was a suspected member of the Border Brothers.

Fierro sued under 42 U.S.C. § 1983. After a four-day trial, the district court instructed the jury to "give deference to prison officials in the adoption and execution of policies and practices that, in their judgment, are needed to preserve discipline and to maintain internal security in a prison." Fierro argues on appeal that this jury instruction should not have been given and that the jury might not have ruled against him in its absence.[1] We agree. Because the evidence at trial reflected a genuine dispute whether the decisions to deny Fierro's requests for protective custody were made pursuant to a security-based policy, and, if so, whether the decisions were an unnecessary, unjustified, or exaggerated response to security concerns, we hold that this instruction was erroneous. That error may have affected the verdict, so we vacate and remand for a new trial.

## I.

## A.

Protective custody is the highest form of protection available to Arizona prisoners. Those in protective custody are removed from the general population and housed only with prisoners granted the same protective custody status.

When an Arizona prisoner requests protective custody, the request triggers a multi-step review procedure. Each step is documented in a protective custody file for that prisoner. Upon receipt of the prisoner's initial request, a shift

---

[1] Fierro also challenges various pretrial decisions by the district court. We address those challenges in a memorandum disposition filed concurrently with this opinion.

commander immediately isolates the prisoner in a secure area and interviews him about his need for protection. The deputy warden in charge of the prison unit then assesses whether further investigation is required. If the deputy warden orders additional investigation, a "correctional officer IV" works with a special security unit to review the file, gather additional facts, and complete a report indicating whether certain risk factors are present. The deputy warden reviews this report along with the full file and recommends denial or approval of protective custody. If the deputy warden recommends denial, she may recommend a lesser form of protection, such as transferring the prisoner to another unit or adding a fellow inmate to a "do-not-house-with" list. A protective custody administrator or committee then reviews the file, decides whether protective custody is warranted, and provides a written explanation if the decision differs from the deputy warden's recommendation. The prisoner may appeal that decision to the security operations administrator, who reviews the case and issues a written response.

**B.**

Fierro made his first request for protective custody in response to a fight with his cellmate, a suspected member of the Border Brothers, at the Lewis-Rast Unit in Buckeye, Arizona. According to Fierro, his problems at that unit began when another inmate came to his cell and divulged that a correctional officer had told several inmates to "keep an eye on" Fierro, leading the inmates to infer that Fierro was a "snitch." Fierro's cellmate accused Fierro of being a "rat," the two got into a fist fight, and Fierro accidentally

punched a wall and broke his hand.[2]   Fierro was not forthcoming in his protective custody interview, stating only that "it would be best if he got off the yard."   The correctional officer IV determined that Fierro's concern was not gang-related and that his injuries were self-inflicted. The deputy warden recommended an alternative placement in lieu of protective custody, and Fierro was transferred to the Cimarron Unit in Tucson.

Fierro requested protective custody a second time.  He reported that he had a scuffle with his new cellmate—a suspected Border Brothers leader—and that, later, unidentified inmates entered his cell, hit him, and took his legal papers and address book.  Fierro explained in his protective custody interview that the inmates accused him of being a snitch and that he feared the Border Brothers were targeting him.  Fierro's request for protective custody was forwarded to a correctional officer IV, who concluded that none of Fierro's claims were substantiated.  The acting deputy warden, Defendant Pannan Days, agreed, concluding that there was no evidence to suggest a gang-related threat and that Fierro had given no reason why he might be perceived as a "snitch."  Days recommended an alternative placement and added the cellmate to Fierro's do-not-house-with list.  Fierro appealed, but Defendant Keith Smith denied the appeal because, among other reasons, there was no

---

[2] Fierro later received a disciplinary violation for false reporting because he had stated in a letter that his hand was injured in a fight, whereas he told the protective custody investigator that he had broken his hand by hitting a wall.  It is unclear why these two stories are inconsistent; the record suggests that Fierro was fighting with his cellmate when he swung, missed, and accidentally hit the wall, breaking his hand.  The disciplinary report was apparently included in Fierro's protective custody file, but the violation was later dismissed and deleted from Fierro's record.

evidence of "a state-wide threat" and Fierro's claims were "self-reported and unsubstantiated." Fierro was then transferred to the Lewis-Morey Unit in Buckeye.

Fierro requested protective custody a third time. He reported that, the day he arrived at the Lewis-Morey Unit, a note was passed under his cell door that told him to "leave the yard or get stuck." Fierro said he believed the note was related to his fight with his former cellmate at the Cimarron Unit and said he feared for his life in the general population. A correctional officer IV documented Fierro's claims and confirmed that Fierro's former cellmate at the Cimarron Unit was indeed a suspected Border Brothers member. This time, Deputy Warden Douglas Schuster reviewed the file and recommended that protective custody be granted. But Defendant Marlene Coffey, the protective custody administrator, concluded that there was no threat against Fierro and overruled Schuster's recommendation. Fierro was subsequently transferred to the Dakota Unit in Yuma.

In his fourth request for protective custody, Fierro reported that he was "told to leave the yard" by the Border Brothers, and that he had overheard one inmate tell another to wait until later to beat Fierro up. Fierro stated that he was being threatened by the gang for having previously requested protective custody. The deputy warden, Defendant Rose Sanders, recommended denial of the request for protective custody because, among other reasons, Fierro had previously made three similar requests and had not been assaulted at the Dakota Unit. Defendant Coffey agreed. Defendant Smith rejected Fierro's subsequent appeal, stating that Fierro's allegations were self-reported and unsubstantiated. Fierro was then transferred to the Kaibab Unit in Winslow.

Fierro made his fifth request for protective custody at the Kaibab Unit, reporting that he had received a note saying,

"Now if you wanna fix your problem you're going to have to run with the raza [gang] & put in some work by stabbing and killing whoever we tell you to." A correctional officer IV reported that Fierro said he had had issues with the Border Brothers in the past and that he had thought about taking the offer presented in the note because his requests for protective custody kept being denied. The deputy warden, Defendant Heather Pruett, recommended denying Fierro's request because, among other reasons, Fierro's claims were self-reported and he had not been assaulted. Pruett further stated that Fierro appeared to be "manipulating the . . . process to get him[self] off the yard," and that he had "other placement options available to him where he c[ould] house successfully." Defendant Coffey agreed. Fierro appealed unsuccessfully to Defendant Smith, who reiterated that Fierro's allegations were self-reported and unsubstantiated. Fierro was transferred to the Central Unit in Florence, where he did not make any requests for protective custody.[3] Nearly a year later, he was transferred back to the Cimarron Unit.

While at the Cimarron Unit, Fierro filed his sixth request for protective custody after an inmate reportedly told him to leave the yard. Fierro explained that he had previously been assaulted at the Cimarron Unit and that the inmates there knew about his "issues" and his past requests for protective custody. A correctional officer from the special security unit ran Fierro's name through several "hit list" databases and found no evidence that Fierro faced a gang-related threat. The deputy warden, Defendant Linda Forester,

---

[3] Fierro was in maximum custody at the Florence Unit, and it is not clear from the record why he was placed there or why he was eventually transferred out. At trial, Fierro testified that he had no roommate and minimal interaction with the general population at the Florence Unit—it was "24/7 lockdown and controlled movement."

recommended an alternative placement because, among other reasons, the special security unit had found no evidence of a statewide threat or any gang-related issues. Defendants Coffey and Smith agreed. In denying Fierro's appeal, Defendant Smith explained: "Investigation reveals that there is no evidence to support [gang]-related issues. Investigation reveals that there is no evidence to support the existence of a state-wide threat. Your allegations are self-reported and unsubstantiated. You were not threatened. You were not assaulted."

After his sixth request was denied, Fierro was transferred back to the Lewis-Morey Unit, where Deputy Warden Schuster had previously recommended protective custody. Within fifteen minutes of his arrival, Fierro was assaulted by two inmates, at least one of whom was a suspected Border Brothers member. Fierro fell to the ground and assumed the fetal position as his assailants repeatedly punched and kicked him. The nurse who treated Fierro recalled that Fierro was walking with a limp and suffered "bumps, bruises, and contusions." Fierro later contended that the attack exacerbated his preexisting health conditions and caused him months of severe physical and mental suffering, though Defendants disputed this.

After the attack at the Lewis-Morey Unit, Fierro's seventh request for protective custody was granted.

## C.

Deputy Warden Schuster, who had recommended granting Fierro protective custody, testified at trial in support of Fierro. All six Defendants took the stand to defend themselves.

Deputy Warden Schuster testified that when Fierro had first been housed at the Lewis-Morey Unit and made his third request for protective custody, it had been "crystal clear" that Fierro needed protection because Fierro was the target of an "identified gang threat from a well-established very functioning gang." Schuster told the jury, "It was very important as a Deputy Warden [that Fierro be placed in protective custody] because I didn't want another assault occurring on my yard and for his protection." He explained that his team of officers had informed him that Fierro needed protection or Fierro was "going to get hit." A high-ranking Border Brothers member who was working as a confidential informant for Schuster's team had corroborated the threat against Fierro. But Schuster also told the jury that the informant's tip was only "the icing on the cake," because it was clear from the records in Fierro's protective custody file that he needed protection.

In their testimony, Defendants largely reiterated the rationale for denying protective custody that they had recorded in Fierro's protective custody file: Fierro's claims were self-reported and unsubstantiated, and there was no evidence of a statewide or gang-related threat. When questioned at trial, most Defendants admitted that they knew Deputy Warden Schuster had recommended protective custody on Fierro's third request, but some of them explained that there was nothing in the file to indicate that Schuster had relied on a confidential informant, so there was no reason for them to investigate further.[4]

---

[4] Schuster explained at trial why he did not record anything about the confidential informant in Fierro's file: "You generally don't refer to specifics regarding informants because any little bit of information that you provide can lead ultimately to the identification of that informant."

Defendants also gave some explanations that they had not documented in Fierro's protective custody file. Defendant Pruett said she was concerned by a report in his file that Fierro had considered complying with an order from gang members to stab someone to appease them because he could not get protection from the prison. She also stated that as part of her review, she "look[s] at the disciplinary record," but she never referenced any aspect of Fierro's disciplinary record. Defendant Sanders also testified that she would normally look at an inmate's disciplinary history before recommending protective custody, and she said that "in this case, what you would see is you're going to see multiple disciplinaries."[5] But she did not state that she actually relied on Fierro's disciplinary history when she recommended denial of his request for protective custody. Defendants also described general concerns motivating the protective custody review process, such as the safety of prisoners already in protective custody and the need to protect them from gang members or "predator[s]" who might infiltrate the system, the need to limit the population in protective custody given the high volume of requests, and the availability of better programs and opportunities for rehabilitation in the general population because the protective custody programming is restricted.

---

[5] It is not clear what "multiple disciplinaries" Sanders was referencing in her testimony. Of the five disciplinary reports Defendants sought to introduce at trial, only one predated Pruett's and Sanders's recommendations that Fierro be denied protective custody. As discussed above, that single disciplinary report stated that Fierro had lied about a hand injury, but the violation was later dismissed and deleted from Fierro's record. *See supra* n.2. Whether it was dismissed before or after Pruett and Sanders reviewed Fierro's protective custody file is not evident from the record before us.

**D.**

After the third day of trial, the district court heard argument on the parties' proposed jury instructions. Fierro's counsel objected to a proposed instruction that the jury "should give deference to prison officials in the adoption and execution of policies and practices that, in their judgment, are needed to preserve discipline and to maintain internal security in a prison." This so-called "deference instruction" came from the Ninth Circuit's then-current model jury instructions for "Convicted Prisoner's Claim of Failure to Protect," Ninth Cir. Model Civ. Jury Instr. § 9.28 (2017 ed.). The district court held that the instruction was required under Ninth Circuit precedent and gave the instruction to the jury.

The jury found all Defendants not liable, and judgment was entered. Fierro timely filed this appeal.

**II.**

Where, as here, an objection to jury instructions was timely raised in the district court, "[w]e review de novo whether a district court's jury instructions accurately state[d] the law." *Coston v. Nangalama*, 13 F.4th 729, 732 (9th Cir. 2021) (quoting *Hung Lam v. City of San Jose*, 869 F.3d 1077, 1085 (9th Cir. 2017)). "Use of a model jury instruction does not preclude a finding of error." *United States v. Warren*, 984 F.2d 325, 327 n.3 (9th Cir. 1993). "But if any error relating to the jury instructions was harmless, we do not reverse." *Coston*, 13 F.4th at 732 (quoting *Spencer v. Peters*, 857 F.3d 789, 797 (9th Cir. 2017)).

## III.

## A.

The concept of deference to prison officials conveyed in the challenged jury instruction originated in a line of cases in which the Supreme Court discussed how courts should evaluate challenges to prison policies. The Supreme Court instructed that, because "problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions," prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *see also Whitley v. Albers*, 475 U.S. 312, 321–22 (1986). But the Supreme Court also emphasized that the deference principle "does not insulate from review actions taken in bad faith and for no legitimate purpose," *Whitley*, 475 U.S. at 322, and that courts may not "abdicate their constitutional responsibility to delineate and protect fundamental liberties," *Pell v. Procunier*, 417 U.S. 817, 827 (1974). Thus, courts should defer to the judgment of prison officials "unless the record contains substantial evidence showing [that] their policies are an unnecessary or unjustified response to problems of jail security," *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 322–23 (2012), or that the officials have "exaggerated their response to [security] considerations," *Pell*, 417 U.S. at 827.

The Supreme Court did not discuss jury instructions in any of those cases. In interpreting them, we have grappled with whether and when a district court should instruct a jury to "give deference to prison officials in the adoption and execution of policies and practices that in their judgment are needed to preserve discipline and to maintain internal

security." *See, e.g.*, *Norwood v. Vance*, 591 F.3d 1062, 1066, 1069 (9th Cir. 2010); *Chess v. Dovey*, 790 F.3d 961, 972 (9th Cir. 2015).

Our decisions establish two conditions that inform whether the deference instruction should be given when prisoners assert Eighth Amendment claims challenging their treatment in prison.[6]   Those conditions are whether the treatment the prisoner challenges (1) was provided pursuant to a security-based policy or practice, and, if so, (2) was a necessary, justified, and non-exaggerated response to security needs.  Depending on whether those two conditions are satisfied, three situations can arise.  First, in cases where there is no genuine dispute that *both* conditions are met, the deference instruction must be given. *See Norwood*, 591 F.3d at 1066, 1069.  Second, in cases where there is no genuine dispute that *either* condition is *not* met (including when it is undisputed that both are not met), the deference instruction may not be given—in fact, the jury instructions should say nothing about deference to prison officials. *See Chess*, 790 F.3d at 972; *Shorter*, 895 F.3d at 1189.  Third, in the remainder, the deference instruction may not be given, but it might be appropriate to instruct the jury that "whether to give deference to prison officials [is] left to the jury to decide." *Coston v. Nangalama*, 13 F.4th 729, 735 (9th Cir. 2021).

---

[6] This framework also applies to pretrial detainees challenging their conditions of confinement under the Fourteenth Amendment.  "Although claims by pretrial detainees arise under the Fourteenth Amendment and claims by convicted prisoners arise under the Eighth Amendment, our cases not distinguish among pretrial and post-conviction detainees for purposes of the excessive force, conditions of confinement, and medical care deference instructions." *Shorter v. Baca*, 895 F.3d 1176, 1182 n.4 (9th Cir. 2018).

*Norwood* is an example of the first type of case. In *Norwood*, a prisoner alleged that his Eighth Amendment rights were violated when he was denied outdoor exercise during a series of prolonged prison lockdowns imposed after several attempted murders of correctional officers. 591 F.3d at 1065–66. At trial, the defendant prison officials requested an instruction that would have told the jury to "give deference to prison officials in the adoption and execution of policies and practices that in their judgment are needed to preserve discipline and to maintain internal security in a prison." *Id.* at 1066. Concerned that the instruction would confuse the jury, the district court rejected the proposed instruction, *id.* at 1067, and the jury returned a verdict for the plaintiff, *id.* at 1066. We reversed, holding that the district court had erred in failing to give the requested instruction. *Id.* at 1067. "*Norwood* [involved] an unusual and highly volatile set of security-related concerns," as to which we concluded that deference to prison officials' security-based judgments was warranted as a matter of law. *Shorter*, 895 F.3d at 1186.

*Chess* and *Coston* are examples of the second type of case. In both *Chess* and *Coston*, it was undisputed that the first condition was not met. The plaintiffs in both cases challenged the sudden discontinuation of their pain medication, without tapering, by prison medical staff. In *Chess*, the prison had a policy prohibiting inmates in the general population from receiving certain narcotics, but the defendants did not invoke the policy to defend their decision—and the plaintiff had not even been in the general population at the time his methadone was cut off. 790 F.3d at 965, 974–75. We therefore held that there was no connection between the narcotics policy and the decision at issue. *Id.* at 975. In *Coston*, the prison staff failed to follow their own requirement to observe the distribution of

medication, discovered that the plaintiff was collecting pills, and terminated the plaintiff's morphine prescription. 13 F.4th at 734. We held that the defendants' breach of protocol "br[oke] any plausible connection between a security-based policy or practice and the medical decision being challenged." *Id.* In both cases, the district court had instructed the jury to "give deference to prison officials in the adoption and execution of policies and practices that, in their judgment, are needed to preserve discipline and to maintain internal security." *Id.*; *Chess*, 790 F.3d at 969. We held that, although each prison had a narcotics policy motivated by institutional security concerns, it was undisputed that the challenged medical decision was not made pursuant to that policy—and thus it was error to give the deference instruction. *Chess*, 790 F.3d at 974; *Coston*, 13 F.4th at 734.

*Shorter* is also an example of the second type of case, and it reflects a situation in which the second condition was not met. The plaintiff challenged a practice in a women's jail of leaving inmates chained to their cell doors for hours, mostly unclothed and without access to food, water, or a toilet, if they did not comply with strip-search procedures. *Shorter*, 895 F.3d at 1179. The district court had given a deference instruction identical to the one given in *Chess* and *Coston*. *Id.* at 1182. We reversed, explaining that although the searches may have been conducted for security reasons, it was undisputed that the manner in which they were conducted was unnecessarily humiliating and abusive. *Id.* at 1189. At trial, jail officials acknowledged that there was no legitimate reason to leave detainees unclothed after their clothing had already been searched, and the watch commander testified that the practice of chaining detainees to their cell doors "shouldn't happen." *Id.* at 1188. The county had in fact abandoned and disavowed the practice by

the time of trial. *Id.* at 1189. In light of these concessions, we held that the jail officials "as a matter of law" were not entitled to deference—and thus the jury should not have been given any deference instruction. *Id.*

In *Coston*, we discussed the third type of case—in other words, what happens when it is not resolvable as a matter of law whether the prison officials are entitled to deference. As explained above, it was undisputed in *Coston* that the decision by prison medical staff to cut off the plaintiff's pain medication was unconnected to any security-based policy. 13 F.4th at 734. The defendants as a matter of law were not entitled to deference on that record. But we explained that, if the defendants could "show at retrial a genuine dispute of material fact over whether [their] actions were (1) taken because of a security-based policy or practice and (2) necessary, justified, and not exaggerated," then either no instruction about deference should be given, or the jury "must be explicitly instructed" that "whether to give deference to prison officials [is] left to the jury to decide." *Id.* at 735. We will refer to this latter instruction as a "jury's choice" instruction.[7]

---

[7] The "jury's choice" instruction could risk confusion without much added benefit. *Cf.* David J. Barron & Elena Kagan, *Chevron's Nondelegation Doctrine*, 2001 Sup. Ct. Rev. 201, 227 n.98 (2001) (suggesting that *Skidmore* deference amounts to nothing "more than a court saying 'we will defer to the agency if we believe the agency is right'"). Accordingly, the "jury's choice" instruction is not necessary in all cases of this third type. But when factual disputes have made whether to defer unclear—for example, if prison officials have presented expert testimony supporting the officials' contested judgments—it may be important to instruct the jurors that it is ultimately up to them to decide whether to defer to the prison's choices.

To summarize, in each of the above types of cases, the relevant question is whether there is a genuine dispute about jail officials' entitlement to deference. Only if the evidence compels the conclusion that both conditions for deference are met—or that either condition is not met—is the deference question resolvable as a matter of law. In the first type of case, deference is warranted, and the court should instruct the jury to defer; in the second type, deference is not warranted, and the court should not include any deference instruction. If there is a genuine dispute whether deference is appropriate, a court has the option either to give no deference instruction at all or to explain to the jurors that it is their choice whether to give deference.

## B.

Applying this framework, we hold that the deference instruction given to Fierro's jury was erroneous.[8]

We first consider whether there was a genuine dispute as to whether Defendants denied Fierro's protective custody requests pursuant to a security-based policy or practice. We conclude that there was. Defendants raised institutional security concerns at trial, explaining that they had a duty under the protective custody procedures to protect *all* prisoners, especially those already in protective custody.[9]

---

[8] We observe that *Coston* was decided after the trial in this case, so the district court did not have the benefit of its guidance when formulating the jury instructions.

[9] Fierro suggests that "post hoc rationales offered at trial" should be given less weight than Defendants' contemporaneous justifications for denying Fierro's requests. The relative weight of Defendants' written explanations and their later testimony is a question for the jury. If the jury were to conclude that the security concerns articulated after the fact

But those explanations are in tension with Defendants' contemporaneous rationales for denying protective custody, which did not cite security concerns and instead focused on their view that Fierro's claims were "self-reported and unsubstantiated." The security justification was also contested by Deputy Warden Schuster's testimony. As mentioned above, Schuster urged that a genuine concern for security would have resulted in putting Fierro in protective custody. That Fierro was assaulted within fifteen minutes of his arrival at the Lewis-Morey Unit supports Schuster's view that Fierro faced a clear threat. This genuine dispute takes this case out of the first category in the framework above, so the deference instruction should not have been given.

Even if it had been undisputed that Defendants' decisions were made pursuant to a security-based policy, the deference instruction still would have been erroneous because there was a genuine dispute whether their actions were necessary, justified, and not exaggerated. Defendants testified about the need to limit access to protective custody—and to keep gang members or "predators" out— for the security of those already in protective custody. It is unclear, however, whether those broader concerns had any bearing on the denials of protective custody in Fierro's case. Only two Defendants suggested at trial that Fierro's conduct in prison informed their decisions: Both Sanders and Pruett mentioned Fierro's disciplinary history, and Pruett also said she was concerned that Fierro had apparently considered complying with the order from gang members to stab someone. If those concerns did motivate the denials, there was at least a dispute whether they were exaggerated or unjustified. The only disciplinary report for Fierro that was

___

were not true reasons for the decision, that could "break[] any plausible connection [to] a security-based policy." *Coston*, 13 F.4th at 734.

admitted at trial and could have informed their decisions was the one alleging that Fierro had lied about how he had broken his hand, which appears to have been unsupported. *See supra* n.2. Moreover, the testimony about the threatening order from the gang could be interpreted to show that Fierro really needed protection, not that he was dangerous, making Pruett's response unjustified.

On the record as a whole, we hold that there was "a genuine dispute of material fact over whether [Defendants'] actions were (1) taken because of a security-based policy or practice and (2) necessary, justified, and not exaggerated." *Coston*, 13 F.4th at 735. In other words, this case fell into the third category in the framework described above. The jury therefore should not have been instructed that it was required to defer to Defendants' security-based judgments—at most, it should have been given a "jury's choice" instruction.

## C.

An error in a jury instruction is harmless if the defendants demonstrate that "it is more probable than not that the jury would have reached the same verdict had it been properly instructed." *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (quoting *Dang v. Cross*, 422 F.3d 800, 811 (9th Cir. 2005)). Defendants have not met their burden of proving harmlessness here. We have repeatedly recognized that the deference instruction deals a "devastating blow" to a plaintiff's constitutional claims and may amount to a "command to direct a verdict in favor of the government." *Shorter*, 895 F.3d at 1190 (first quoting *Harrington v. Scribner*, 785 F.3d 1299, 1307 (9th Cir. 2015), then quoting *Norwood*, 591 F.3d at 1072 (Thomas, J., dissenting)). Because Defendants persistently denied Fierro's pleas for protection despite evidence that he faced a serious threat, the

jury might well have returned a verdict in his favor if not for the deference instruction.

Accordingly, we vacate and remand for a new trial.

**VACATED AND REMANDED.**