**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MICHAEL CHESS,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>J. DOVEY, Director of Corrections;<br>ABUL, Doctor of the CDC; MIDGE<br>MILLER, Nurse Practitioner; ROCHE,<br>Medical Doctor of the CDC; JAMES,<br>Medical Doctor of CDC; DIAL,<br>Medical Doctor of CDC; G.<br>DUDLEY, Physician's Assistant;<br>ANITA DAVID; M. FRENCH, Nurse<br>Practitioner; S. ABDUR-RAHMAN; T.<br>FELKER, Warden,<br>*Defendants-Appellees*. | No. 12-16516<br><br>D.C. No.<br>2:07-cv-01767-<br>DAD<br><br>OPINION |

Appeal from the United States District Court
for the Eastern District of California
Dale A. Drozd, Magistrate Judge, Presiding

Argued and Submitted
October 7, 2014—San Francisco, California

Filed June 25, 2015

Before: William A. Fletcher and Paul J. Watford, Circuit Judges, and Kevin Thomas Duffy, District Judge.[*]

Opinion by Judge W. Fletcher

---

**SUMMARY**[**]

---

**Prisoner Civil Rights**

The panel affirmed the district court's judgment, entered following a jury verdict, in an action brought under 42 U.S.C. § 1983 by a California state prisoner who alleged that he was denied constitutionally adequate medical care when members of the prison's medical staff denied him effective pain medication.

On appeal, plaintiff asserted that the magistrate judge erred in instructing the jury to give deference to prison officials in the adoption and execution of policies and practices that in their judgment are needed to preserve discipline and to maintain internal security.

The panel first held that when a pro se civil litigant fails to object to a jury instruction, the court should review the instruction under the ordinary standard of review, rather than for plain error, if the district court and opposing party were

---

[*] The Honorable Kevin Thomas Duffy, United States District Judge for the Southern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

fully aware of the potential problem with, and would-be objection to, the instruction.

The panel held that the deference instruction should not ordinarily be given in Eighth Amendment medical care cases brought by prisoners. Rather, a trial judge in an Eighth Amendment medical care case should only give the deference instruction if one party's presentation of the case plausibly draws a connection between the security-based policy or practice and the medical care decision at issue. Neither party drew such a connection in this case. Nevertheless, although the panel concluded that the jury instruction was error, it did not reverse the judgment because defendants carried their burden of showing that it was more probable than not that the jury would have reached the same verdict had it been properly instructed. The error therefore was harmless.

## COUNSEL

Stephen Patrick Blake (argued), Alexis Coll-Very, Simpson Thacher & Bartlett LLP, Palo Alto, California, for Plaintiff-Appellant.

Thomas S. Patterson (argued), Supervising Deputy Attorney General, Office of the California Attorney General, San Francisco, California; Kamala D. Harris, Attorney General, Jonathan L. Wolff, Senior Assistant Attorney General, Diana Esquivel and Vickie P. Whitney, Deputy Attorneys General, Office of the California Attorney General, Sacramento, California, for Defendants-Appellees.

## OPINION

W. FLETCHER, Circuit Judge:

Appellant Michael Chess brought this action under 42 U.S.C. § 1983 against eight members of the medical staff at California's High Desert State Prison, alleging that they denied him constitutionally adequate medical care while he was incarcerated there. Chess represented himself at trial. Two Eighth Amendment claims of deliberate indifference went to trial. As characterized in the final pretrial order, they were (1) that "defendants denied [plaintiff] effective pain medication; specifically, that defendants purportedly discontinued plaintiff's use of methadone solely because a High Desert State Prison policy prohibit[ed] general-population inmates from receiving that medication"; and (2) that "defendants prescribed plaintiff medication, including Tylenol, aspirin, niacin, and Naprosyn, knowing that those drugs were harmful to his liver." The jury returned a verdict for defendants on both claims.

Chess makes only one contention on appeal. He contends that the magistrate judge erred in giving a jury instruction that read in pertinent part:

> In determining whether the defendants violated the plaintiff's rights as alleged, you should give deference to prison officials in the adoption and execution of policies and practices that in their judgment are needed to preserve discipline and to maintain internal security.

This language is taken from a Ninth Circuit model instruction based on *Norwood v. Vance*, 591 F.3d 1062 (9th Cir. 2010), and is entitled, "Prisoner's Claim [Regarding] Conditions of Confinement/Medical Care." *See* Ninth Cir. Model Civ. Jury Instr. § 9.25 (2010 ed.). Chess did not object to the instruction.

We must first decide the standard of review that governs Chess's appellate challenge to the jury instruction. We hold that when a pro se civil litigant fails to object to a jury instruction, we will review the instruction under the ordinary standard of review, rather than for plain error, if the district court and opposing party were fully aware of the potential problem with, and would-be objection to, the instruction. In such circumstances, an objection would be tantamount to a "pointless formality." *United States v. Payne*, 944 F.2d 1458, 1464 (9th Cir. 1991).

We must also decide whether the magistrate judge erred in giving the challenged instruction. Contrary to the title of the model instruction, we hold that the deference instruction should not ordinarily be given in Eighth Amendment medical care cases brought by prisoners. Rather, the instruction may be given only when there is evidence that the treatment to which the plaintiff objects was provided pursuant to a security-based policy. That was not the case here. We therefore hold that giving the instruction in this case was error. However, because the error was harmless, we affirm the judgment of the district court.

## I. Facts and Procedural Background

### A. The Narcotics Policy at HDSP

Chess was imprisoned in California's High Desert State Prison ("HDSP") from November 21, 2006, until February 8, 2011. A prison policy in effect from sometime in 2006 to sometime in 2007 (the precise dates are not specified in the record) prohibited members of HDSP medical staff from prescribing narcotic drugs to prisoners who were assigned to general inmate housing. However, medical staff were allowed to dispense narcotic drugs to prisoners while in the prison's infirmary, the Correctional Treatment Center ("CTC").

Defendant Dr. Steven Roche, the medical director of the prison at the relevant time, testified about the HDSP policy:

> [T]he policy was that we had narcotics available for use in the emergency room and in the infirmary. The issue was that we could not control narcotics on the yards. We didn't have a process in place to document the use of narcotics. And so essentially the warden decided that he was not going to allow narcotics on the yard at all. If a patient needed narcotics, morphine, those kinds of things, then he would have to be admitted to the infirmary and given the narcotics in the infirmary or transferred to a different facility that had the ability to take care of him.
>
> And again, the problem with the narcotics was that these were valuable to inmates. I

mean they had a certain cash value depending upon the narcotic. In addition, just inventorying the narcotics within the clinic itself was inadequate. The pharmacist at the time called the Board of Pharmacy because he was not able to verify who was using the narcotics that he was bringing out to the clinic at one point, and the Board of Pharmacy said that by pharmacy regulations, he did not have to provide narcotics if he didn't know where they were going.

## B. Evidence at Trial

Chess had been transferred from another California state prison to HDSP. He arrived with a variety of ailments, including blindness in his left eye, hepatitis C, hypertriglyceridemia (elevated levels of triglycerides), left varicocele (enlargement of the scrotum vein), gallstones, kidney stones, degenerative disc disease of the cervical spine, bloody urine, and a seizure disorder. According to his complaint, these ailments caused Chess to suffer cramps in his lower extremities, sharp abdominal pain, uncontrolled muscle twitching, headaches, skin rashes, loss of balance, and constant pain. Prior to his transfer to HDSP, doctors at California State Prison, Solano, had prescribed Klonopin (a muscle relaxant), methadone, and other medications.

Chess was assigned to the general population when he arrived at HDSP, but as a new prisoner he was initially placed in the CTC. While in the CTC, medical staff gave him "tapering-off" doses of Klonopin until he was fully weaned from the drug. Medical staff cut off his methadone without any tapering. Chess was discharged from the CTC into the

general prison population on December 26, 2006, a little
more than a month after his arrival at the prison.

Chess testified that he suffered substantial pain while in
the CTC due to sudden withdrawal of his methadone:

> And yes, I did ask to be put back on
> methadone. I was on it for about four or five
> years before I went up there, and I have
> documentation that states from a liver
> specialist that it is not very harmful to your
> liver.
>
> They keep saying—they kept saying
> yesterday that they couldn't give it to me
> because they didn't allow it in general
> population, but the CTC, the Correctional
> Treatment Center where they had me, is not a
> general population. It's like a little small
> hospital with single rooms. And the whole
> time I spent there was a nightmare. It was
> miserable. And I was in pain the whole time.
> And like I said, the [naproxen], the aspirin,
> multivitamins, I don't have any idea why they
> gave those to me. That's not a pain
> medication. And neither is folic acid. That's
> a vitamin B. And they say they treated me for
> pain, which is not true.
>
> And the whole time I spent in there until
> the time they did put me in general
> population, I was in pain. And I don't know
> what their real reason was, why they wouldn't

treat me for pain, but they wouldn't and they didn't.

After his placement in general population housing, Chess repeatedly asked for methadone and complained of pain. He filed numerous administrative grievances and frequently visited the defendant doctors, nurses, and physician assistants. The medical staff at HDSP never prescribed methadone, despite Chess's numerous requests and reiterated complaints that his prescribed pain medication was inadequate.

Eight members of HDSP medical staff were named as defendants—four doctors, two nurse practitioners, and two physician assistants. They all testified at trial. Chess testified on his own behalf, but did not put on the stand any expert witness or otherwise provide expert evidence to contradict defendants' testimony.

Dr. Roche did not treat Chess directly but oversaw and approved his treatment. He testified that there were important medical reasons to take Chess off of methadone. In response to a question from the judge, he explained:

> I think my staff at the time evaluated him appropriately, hospitalized him, and we[a]ned him off of his Klonopin. The problem with a combination of sedative drugs and a drug like methadone is [that] there are complications to this, side effects to it, including death. Methadone is a very complicated drug to administer and to monitor. . . . I would have to say that the combination that he was on [before coming to HDSP] was somewhat inappropriate.

In response to a question from Chess, Dr. Roche testified:

> There are benefits to almost every medicine you can think of, but there are also risks to almost every medicine you can think of.
>
> For instance, that type of reasoning was why you were hospitalized when you first came [to HDSP] and you were taken off of your Klonopin and your methadone because they're dangerous in that environment, and particularly in a patient like yourself with your compliance issues.

Dr. Roche described the narcotics policy at HDSP, as indicated above, but except for his reference to the dangerousness of Klonopin and methadone "in that environment," he never stated or even suggested that the refusal to provide methadone to Chess was based on the policy.

Dr. Lino Dial provided initial treatment to Chess when he arrived at HDSP. He saw Chess only once, immediately after his arrival. According to the final pretrial order, the following was undisputed:

> 8. On November 22, 2006, defendant Dr. Dial examined plaintiff and evaluated his medications. 9. Plaintiff's medications were adjusted to comply with HDSP policies. 10. From 2006 to 2007, HDSP had a policy to not provide methadone to patients in general population. 11. Defendant Dr. Dial

prescribed plaintiff Naprosyn/Naproxen [Aleve] and aspirin to treat his pain.

On direct examination Dr. Dial did not mention HDSP's narcotics policy as a basis for ending Chess's methadone prescription. Instead, he testified that he ended it because of the danger it posed to Chess:

> I remember stopping the medicine. Not every one, but some. And I heard earlier one of them is the methadone. . . . And there's a reason for that. At that time people were dying from methadone. Not by the hundreds, but by the thousands.

Dr. Dial said there were two bases for his characterization of methadone as posing a danger. He described a warning from the U.S. Food and Drug Administration, and was about to describe another when the judge cut him off, saying "we don't have a question." On cross examination, defendants' attorney described, one by one, all of the medical conditions from which Chess suffered, and as to each one, asked whether that condition was treated with methadone. Dr. Dial answered "no" each time. The attorney then asked, "Was your decision to discontinue Mr. Chess's methadone prescription based on the 'no narcotics' policy that was in place at the present time?" Dr. Dial answered, "Correct."

Dr. Daniel James was involved in Chess's initial treatment in the CTC and in processing at least one of Chess's internal administrative appeals, but he had no memory of treating Chess. He testified based solely on Chess's medical records. Dr. James mentioned methadone only once, in response to questions by the judge:

> Q: [T]here doesn't appear to be any mention in your treatment notes about any gradual reduction or change in the methadone prescription like there was with the Klonopin. Why is that?
>
> A: I think that withdrawal from a narcotic doesn't involve the same kind of risk of seizures is the main thing.
>
> Q: It seems like it's not addressed at all.
>
> A: No, I can't answer that. I'm not sure why it wasn't. And I don't have my whole records.

Dr. James never mentioned HDSP's narcotics policy in his testimony.

Dr. Salahuddin Abdur-Rahman treated Chess several times at HDSP. He was asked about two specific occasions during which Chess was experiencing pain, and about the appropriateness of methadone as treatment for the pain. The first was on July 4, 2007, when Chess had been prescribed gabapentin, a neuropathic pain reliever. Dr. Abdur-Rahman was asked whether he saw anything that indicated "that he needed something stronger, such as methadone." He answered, "I did not." The second was on September 5, 2007, when Chess had been prescribed morphine for pain after an upper gastrointestinal endoscopy. Dr. Abdur-Rahman was asked whether he had "any information" indicating that the morphine was "inadequate to address any complaints of pain." He answered, "I did not." Then, as a catch-all question, Dr. Abdur-Rahman was asked, "On all

those occasions that you saw Mr. Chess or reviewed his medical records, did you have any information from which you could conclude that he required methadone or stronger pain medication?" He answered, "I did not." Dr. Abdur-Rahman never mentioned HDSP's narcotics policy in his testimony.

Mary Miller, a nurse practitioner, treated Chess on several occasions during his time at HDSP. Ms. Miller first treated Chess in the CTC, shortly after his arrival. According to a stipulation in the pretrial order, "On November 22, 2006, defendant nurse practitioner Miller examined plaintiff and carried out defendant Dr. Dial's orders." Defendants' counsel asked, "Was there anything during your examination of Mr. Chess on that first visit that indicated to you that he needed methadone to address his complaints of pain?" She answered, "No." She was asked at two points later in her testimony whether methadone was an appropriate treatment for Chess. She answered "no" each time. Finally, she was asked whether the prison's narcotics policy was relevant to her treatment decisions:

> Q: On all those occasions that you treated Mr. Chess, did you decide not to prescribe the methadone because of the "no narcotics" policy at the prison?
>
> A: No. I decided that because I didn't think it was best for him.

Melody French, another nurse practitioner, treated Chess on several occasions. Methadone was mentioned three times during her testimony. First, Ms. French testified that methadone does not adversely affect liver function any more

than any other medication. Second, she testified that Chess had asked for methadone as treatment for the pain he was suffering from his varicocele, and that she had refused. When asked, "Why would you not treat his varicocele with methadone?" she answered, "It's not appropriate." Finally, she was asked a catch-all question:

> Q: On all those occasions that you either saw Mr. Chess or reviewed his medical records, was there any evidence from which you can conclude that methadone was indicated to treat any of his complaints?
>
> A: No.

Ms. French did not mention HDSP's narcotics policy in her testimony.

Gilian Dudley, a physician assistant, met with Chess once to address an administrative complaint and she treated him on two occasions. In March 2007, she interviewed Chess in connection with an administrative appeal. Nothing in Chess's medical record indicated to Ms. Dudley that he needed methadone. In October 2007, she increased his dosage of gabapentin. In November 2007, following his return from an outside hospital, she continued a prescription of morphine that had been initiated at the hospital. She testified that on both occasions the medication she prescribed was sufficient to treat Chess's pain, and that methadone was not needed. Ms. Dudley did not mention HDSP's narcotics policy in her testimony.

Finally, Anita David, another physician assistant, treated Chess on several occasions. One of them was in November

2007, when she prescribed Chess decreasing doses of morphine following his return from the outside hospital. Methadone was mentioned only once in Ms. David's testimony, in connection with her treatment of Chess on April 2, 2007. She testified that Chess did not require methadone for his pain on that occasion. Ms. David did not mention HDSP's narcotics policy in her testimony.

Throughout his stay at HDSP, defendants continued to provide non-narcotic painkillers to Chess. On at least two occasions, they gave him a narcotic drug, morphine, for specific conditions, but they never gave him methadone. It is not entirely clear from the transcript if Chess was a patient in the CTC when he was given morphine, but we infer that he was. In their testimony, defendants attributed unnecessary pain Chess might have experienced while he was at HDSP to his "noncompliance." It is undisputed that Chess often refused to take the medication provided to him. Chess acknowledged that he did not take naproxen at all, and refused to continue taking gabapentin because, in his view, these drugs were harmful to his liver.

Chess complained on several occasions that the non-narcotic pain medicine he received was damaging his liver. Defendants testified, however, that the medications they prescribed posed no harm to his liver. For example, Ms. David testified that she did not worry that gabapentin would harm Chess's liver because it is "eliminated a hundred percent through the kidney." Defendants did acknowledge one prescription that might have harmed Chess's liver. Dr. Mayer Horensten, whom Chess did not name as a defendant and who did not testify, ordered a dosage of Tylenol that could have harmed his liver if Chess had taken it as

prescribed. It is unclear from the record, however, how much, if any, Tylenol Chess took pursuant to the prescription.

## C. The Jury Instruction

The magistrate judge solicited the parties' views on jury instructions. Defendants proposed an instruction identical to the Ninth Circuit model instruction entitled, "Prisoner's Claim [Regarding] Conditions of Confinement/Medical Care." *See* Ninth Cir. Model Jury Instr. § 9.25 (2010 ed.). The proposed instruction, which was ultimately given, described the elements of deliberate indifference and then included the following language:

> In determining whether the defendants violated the plaintiff's rights as alleged, you should give deference to prison officials in the adoption and execution of policies and practices that in their judgment are needed to preserve discipline and to maintain internal security.

This language was added to the model instruction in the wake of our decision in *Norwood v. Vance*, 591 F.3d 1062 (9th Cir. 2010). *See* Ninth Cir. Model Civ. Jury Instr. § 9.25 cmt.

Before approving the proposed jury instructions, the judge asked Chess if he had reviewed them and was prepared to state any objections. Chess answered that he had reviewed them but was not prepared to object. The judge made it clear that Chess should object at the next opportunity if he did not like the instructions.

The next day, after defendants' counsel argued in favor of the instruction, the judge expressed misgivings about the deference language. He stated:

> Now, I think I sort of know what you're trying to touch upon in including that proposed language, and maybe that proposed language might be appropriate if the defendants in front of us were prison administrators who were trying to be—or who a plaintiff was trying to hold liable because of policies they had implemented.

> But how does that language apply to these defendants? They can't take policy into consideration in deciding whether or not to provide constitutionally adequate medical care.

Defendants' counsel went back and forth with the judge about the applicability of the deference language in the circumstances of this case. The judge indicated that he was "considering striking [the deference] language" and asked Chess to weigh in again. Chess responded: "I don't quite understand exactly, but I don't have any—I'm going to leave that up to you."

Later that day, the judge raised the instruction issue once more. He noted that the deference language was added to the model instruction after our decision in *Norwood*, which was a conditions of confinement case. But he thought "an argument can definitely be made that [*Norwood*] does not require the inclusion of that language when the question is an Eighth Amendment adequate medical care claim as opposed

to an Eighth Amendment excessive use of force or other conditions of confinement claim." He expressed skepticism that it applied to medical care cases given that "[a] medical care claim really is not a classic conditions of confinement claim." He indicated that if it were up to him, he might not extend it to this case and speculated that the circuit court might someday address the issue. Ultimately, however, he approved the instruction because it was based on the Ninth Circuit model instruction and because "it is at least arguable in this context that we may be in that gray area where policy and medical care or that medical care decisions have to at least take into some account, to some degree, policy issues."

## D. Verdict, Judgment, and Appeal

After the judge denied defendants' motion for judgment as a matter of law, the jury returned a verdict for defendants, upon which the judge entered judgment. Chess timely appealed. We appointed counsel for Chess on appeal.

## II. Standard of Review

Defendants argue that we should not review Chess's challenge to the jury instruction because he waived it by failing to make a timely objection in the trial court. Chess argues that we should review his challenge de novo, or at least for plain error. We hold, in the circumstances of this case, that we should review the instruction de novo. Because the judge comprehensively articulated the problem with the instruction from Chess's point of view, and because Chess, a pro se litigant, effectively gave the judge his proxy, a formal objection was unnecessary. Consequently, we hold that we should review the jury instruction as if Chess had objected to it. Because Chess contends that the instruction is an incorrect

statement of the law, our review is de novo. *See Clem v. Lomeli*, 566 F.3d 1177, 1180–81 (9th Cir. 2009). However, we will not reverse the judgment against Chess if the error was harmless. *See id.* at 1182.

A brief overview of our past and present practice of reviewing jury instructions will help explain our holding. Federal Rule of Civil Procedure 51 requires that a "party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). When a party raises a contemporaneous objection to a jury instruction, we review the jury instruction either de novo or for abuse of discretion, depending on the nature of the error. *See Abromson v. Am. Pac. Corp.*, 114 F.3d 898, 902 (9th Cir. 1997) (abuse of discretion review of the trial court's formulation of civil jury instructions); *Mockler v. Multnomah Cnty.*, 140 F.3d 808, 812 (9th Cir. 1998) (de novo review of civil jury instructions that misstate the law).

We approach unpreserved challenges differently. In the past, we refused to review challenges to jury instructions in civil cases where the party challenging the instruction failed to raise a timely objection in the trial court. *See Hammer v. Gross*, 932 F.2d 842, 847 (9th Cir. 1991) (en banc) ("This court has . . . declared that there is no 'plain error' exception in civil cases in this circuit."). But even in those days, when we "enjoyed a reputation as the strictest enforcer of Rule 51," *id.*, we "acknowledged a limited exception to our strict interpretation of Rule 51." *McGonigle v. Combs*, 968 F.2d 810, 823 (9th Cir. 1992). We would review challenges to jury instructions under our ordinary standards of review, without requiring a plaintiff to make a "futile formal

objection," "[w]here the district court [wa]s aware of a party's concerns with an instruction, and further objection would [have] be[en] unavailing." *Id*. This practice came to be known as the "pointless formality" exception. *See Payne*, 944 F.2d at 1464.

We changed our review of jury instructions after Congress amended Rule 51 in 2003 to provide for plain error review in civil cases. *See* Fed. R. Civ. P. 51(d)(2). Now, when a litigant in a civil trial fails to object to a jury instruction, we may review the challenged jury instruction for plain error. *C.B. v. City of Sonora*, 769 F.3d 1005, 1016 (9th Cir. 2014) (en banc).

The pointless formality exception has survived the 2003 amendment to Rule 51. *Cf. Norwood*, 591 F.3d at 1066 (rejecting the argument that the appellant failed to preserve an objection to a jury instruction because "[a]n objection need not be formal" and "raising the issue again via formal objection would be both unavailing and a pointless formality") (internal quotation marks and citations omitted)); *Citrus El Dorado, LLC v. Stearns Bank*, 552 F. App'x 625, 627 (9th Cir. 2014) ("We need not decide whether an objection was preserved under the 'pointless formality' exception, because the instruction was plain error." (citation omitted)). The only thing that has changed is the general rule from which the exception is taken. Previously the general rule was forfeiture; now it is plain error review.

In this case, an objection by Chess to the instruction now at issue would have been the functional equivalent of a pointless formality. An "objection may be a 'pointless formality' when (1) throughout the trial the party argued the disputed matter with the court, (2) it is clear from the record

that the court knew the party's grounds for disagreement with the instruction, and (3) the party offered an alternative instruction." *Payne*, 944 F.2d at 1464. There can be no doubt that the trial court knew which part of the instruction was problematic and knew the specific reasons why. On two separate occasions, the judge articulated the potential problems with the deference language in the proposed jury instruction: (1) it was irrelevant because Chess was suing prison doctors, and not the administrators who adopted the narcotics policy; and (2) it was inappropriate in medical care cases, as distinct from excessive force and conditions of confinement cases. The judge also recognized the relevant authority, the *Norwood* case. The judge was right when he said, "I did identify the main issue raised by the inclusion of that language in a case such as this."

It does not matter that Chess did not "argue[] the disputed matter with the court." *Medtronic, Inc. v. White*, 526 F.3d 487, 495 (9th Cir. 2008) (quoting *Glover v. BIC Corp.*, 6 F.3d 1318, 1326 (9th Cir. 1993)). Although Chess—who was unrepresented—did not raise the issue himself, the judge understood it and, in effect, argued it on his behalf. The judge characterized the problem from the standpoint of someone in Chess's position, and Chess deferred to the judge. Nor was it necessary for Chess himself to have offered an "alternative instruction," *id.*, for the judge proposed the alternative: strike the deference language and leave the rest of the instruction intact. *See Payne*, 944 F.2d at 1464.

We will not punish a pro se litigant with plain error rather than de novo review simply because he failed to say the words "I object" when the trial judge and defendants knew why the instruction might be erroneous and what the objection would have been. Reviewing for plain error in this

case would run contrary to our "duty to ensure that pro se
litigants do not lose their right to a hearing on the merits of
their claim due to ignorance of technical procedural
requirements." *Balistreri v. Pacifica Police Dep't*, 901 F.2d
696, 699 (9th Cir. 1990). Further, plain error review would
do nothing to advance the purpose of Rule 51, which is "to
enable the trial judge to avoid error by affording him an
opportunity to correct statements and avoid omissions in his
charge before the cause has been decided by the jury." *Inv.
Serv. Co. v. Allied Equities Corp.*, 519 F.2d 508, 510 (9th Cir.
1975); *see also Palmer v. Hoffman*, 318 U.S. 109, 119 (1943)
("In fairness to the trial court and to the parties, objections to
a charge must be sufficiently specific to bring into focus the
precise nature of the alleged error."). Here, Chess did not
attempt to "sandbag" the trial judge by failing to object in
order to take out insurance against an adverse verdict. *See
Elder v. Holloway*, 984 F.2d 991, 998 (9th Cir. 1993)
(Kozinski, J., dissenting) (the purpose of Rule 51 is to
preclude parties from "sandbag[ging]" the trial judge to get
"two bites at the apple"). Chess was confused and legally
unsophisticated. But the judge and defendants' lawyer were
not. They knew what the problem was and debated the issue
vigorously. In these circumstances, any objection by Chess
would have been "'superfluous and futile,'" and plain error
review would be too harsh a sanction for failure to object.
*Obsidian Fin. Grp., LLC v. Cox*, 740 F.3d 1284, 1289 (9th
Cir. 2014) (quoting *Dorn v. Burlington N. Santa Fe R.R. Co.*,
397 F.3d 1183, 1189 (9th Cir. 2005)).

## III. Analysis of the Jury Instruction

After informing the jury of the elements Chess needed to
prove to prevail on his claims, the magistrate judge added a
deference instruction. He directed the jury, pursuant to our

circuit's model instruction, to "give deference to prison officials in the adoption and execution of policies and practices that in their judgment are needed to preserve discipline and to maintain internal security." The magistrate judge was right to doubt the relevance, and hence the propriety, of this instruction. *See United States v. Warren*, 984 F.2d 325, 327 n.3 (9th Cir. 1993) ("Use of a model jury instruction does not preclude a finding of error."). For the reasons that follow, we conclude that trial judges in prison medical care cases should not instruct jurors to defer to the adoption and implementation of security-based prison policies, unless a party's presentation of the case draws a plausible connection between a security-based policy or practice and the challenged medical care decision. No other circuit routinely requires this additional deference in all medical care cases,[1] and neither should we.

## A. The Instruction

The deference language at issue in this case derives from *Whitley v. Albers*, 475 U.S. 312, 321–22 (1986). In that case, an inmate alleged that he was subject to cruel and unusual punishment when he was shot by a prison guard during a riot in which another guard was taken hostage. *Id*. At 316–17.

---

[1] The Ninth Circuit's model jury instructions are also unique in including the deference language in Eighth Amendment conditions-of-confinement cases. Except for language in a Fifth Circuit model instruction, *see* Pattern Jury Instr., Civ., 5th Cir., § 10.7 (2014), and a model instruction developed by a district judge on the First Circuit, the deference language does not appear in any other circuit's model instructions for prisoner rights' claims. *See, e.g.*, Instr. for Civ. Rights Claims under § 1983, 3d Cir., §§ 4.10, 4.11.1 (2014); Fed. Civ. Jury Instr. of 7th Cir., §§ 7.14, 7.15 (2009 rev.); 8th Cir. Civ. Jury Instr., §§ 4.42, 4.43 (2014); 11th Cir. Civ. Pattern Jury Instr., §§ 5.3, 5.4, 5.5 (2013).

The Supreme Court adopted a heightened subjective standard for excessive force claims—malicious and sadistic—instead of the subjective standard governing medical care cases—deliberate indifference. *Id.* at 320–21. The asymmetry was appropriate, the Court explained, because "the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities." *Id.* at 320. In contrast, when prison officials decide to use force to restore order, they act "in haste, under pressure" and must balance competing institutional concerns for the safety of prison staff or other inmates. *Id.*

As a result of *Whitley*, our circuit's model jury instruction for prisoners' excessive force claims directs jurors to "give deference to prison officials in the adoption and execution of policies and practices that in their judgment are needed to preserve discipline and to maintain internal security in a prison." Ninth Cir. Model Civ. Jury Instr. § 9.24 (2013 ed.); *see Norwood*, 591 F.3d at 1067. In *Norwood*, a divided panel of this court held that the deference instruction must be given, not only in excessive force cases, but also in conditions of confinement cases. *Id.* ("Prison officials are entitled to deference whether a prisoner challenges excessive force or conditions of confinement."). However, we said nothing in *Norwood* about medical care cases.

We see nothing in the reasoning of *Norwood* that leads us generally to require its deference instruction in medical care cases. First, *Norwood* derived the deference language from *Bell v. Wolfish*, 441 U.S. 520 (1979), which was "itself a conditions of confinement case." *Norwood*, 591 F.3d at 1067. We cannot do the same derivation here, for the

Supreme Court has not used the same deference language in a medical care case.

Second, and more important, security considerations are usually not present in medical care cases. In the great majority of medical cases, the plaintiff does not point to a security-based practice or policy as the source of his or her harm, and defendants in such cases do not defend their actions on the basis of such a practice or policy. Rather, in the typical case, the plaintiff challenges prison medical staff's refusal or failure to provide certain care. The refusal or failure to provide such care is sometimes based on an administrative policy, but these policies typically do not relate to security or discipline. *See, e.g.*, *Colwell v. Bannister*, 763 F.3d 1060, 1063–64 (9th Cir. 2014) ("It is the policy of the Department that inmates with cataracts will be evaluated on a case by case basis, taking into consideration their ability to function within their current living environment." (quoting the prison's policy)); *Snow v. McDaniel*, 681 F.3d 978, 986 (9th Cir. 2012) (describing the factors a prison medical review board was to consider in deciding whether to approve significant medical procedures, such as "the length of the inmate's remaining sentence, how well the inmate is able to perform activities of daily living, the available resources, and the risks and benefits of the proposal"), *overruled by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc). In these circumstances, where the parties do not put into issue a security-based policy, the deference instruction has no "foundation in the evidence" and should not be given. *Clem*, 566 F.3d at 1181 (quoting *Dang v. Cross*, 422 F.3d 800, 804–05 (9th Cir. 2005)).

Third, the *Norwood* panel reasoned that it made sense to use the deference instruction, which we already use in cases

of excessive force, in cases dealing with conditions of confinement because the use of force and restrictive confinement (which was at issue in *Norwood*) "are often flip sides of the same coin: A more restrictive confinement may diminish the need for force and vice versa." *Norwood*, 591 F.3d at 1067. In our view, medical treatment is quite a different currency. It is different because "the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities." *Whitley*, 475 U.S. at 320; *see also Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) ("[T]he policy of deferring to the judgment of prison officials in matters of prison discipline and security does not usually apply in the context of medical care to the same degree as in other contexts."). And decisions about medical care and policy are not ordinarily made in haste or under stress, unlike many decisions about the use of force or restrictive confinement. Consequently, "[t]he requirement of deliberate indifference is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals." *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). For this reason, in the great majority of cases, "'[i]n deciding whether there has been deliberate indifference to an inmate's serious medical needs, we need not defer to the judgment of prison doctors or administrators.'" *Colwell*, 763 F.3d at 1066 (quoting *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989)).

While the *Norwood* instruction is inappropriate in most medical care cases, *Norwood*'s logic leads us to recognize that the instruction may sometimes, though rarely, be appropriate. We must be attentive to the differences among

medical cases. *Cf. Whitley*, 475 U.S. at 320 (claims under the Eighth Amendment must be analyzed "with due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged"). Not all of them are ordinary. There may be outlier cases in which medical care and security concerns genuinely clash and prison personnel must make their medical care decisions in light of those concerns. *See, e.g.*, *Clement v. Gomez*, 298 F.3d 898, 905 n.4 (9th Cir. 2002) (defendants delayed treating inmates exposed to the pepper spray they used to stop a fight because they needed to maintain order first, which made the case "differ[ent] from most cases involving the deprivation of medical needs"). In those situations, prison officials will have to balance prisoner health and safety against "competing institutional concerns for the safety of prison staff or other inmates." *Whitley*, 475 U.S. at 320. Because this balancing requires the "expert judgments" of prison officials, these decisions are "entitled to deference," just as they are in conditions of confinement cases. *Norwood*, 591 F.3d at 1067; *see Kosilek v. Spencer*, 774 F.3d 63, 83 (1st Cir. 2014) (en banc) ("When evaluating medical care and deliberate indifference, security considerations inherent in the functioning of a penological institution must be given significant weight."); *see also Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510, 1518 (2012) ("The Court has held that deference must be given to the officials in charge of the jail unless there is 'substantial evidence' demonstrating their response to the situation is exaggerated." (quoting *Block v. Rutherford*, 468 U.S. 576, 584–85 (1984))).

In light of the foregoing, we hold that a trial judge may instruct a jury to defer to a policy or practice adopted and implemented by prison officials only when that policy or

practice addresses bona fide safety and security concerns, and when there is evidence that the challenged medical decision was made pursuant to that security-based policy or practice. Put another way, the trial judge in an Eighth Amendment medical care case should not give the deference instruction unless one party's presentation of the case plausibly draws a connection between the security-based policy or practice and the medical care decision at issue.

In Chess's case, this connection was lacking. It was therefore error for the magistrate judge to give the deference instruction. Chess alleged that defendants denied him methadone solely because a High Desert State Prison policy prohibits general population inmates from receiving that medication. But, crucially, he did not introduce any evidence at trial that the narcotics policy affected the key decision he challenged—defendants' decision to cut off methadone, rather than tapering it off while he was in the CTC. He testified that "the whole time I spent in [the CTC] until the time they did put me in the general population, I was in pain. And I don't know what their real reason was, why they wouldn't treat me for pain, but they wouldn't and they didn't." Chess did not dispute that the narcotics policy explicitly allowed the administration of methadone in the CTC. Indeed, he told the jury in his opening statement that, although defendants claimed that they could not give him methadone because he was in general population housing, they could have provided it to him in the CTC. He explained, "[T]hey have something up there which is called CTC. It's a treatment center, like a little hospital. And that's not the general population. They could have went and got a nonformulary drug, just like they did for the Klonopin, to taper me off of [methadone]." It is true that Chess also sought a prescription for methadone after he was transferred

to the general prison population. Theoretically, then, the policy could have affected the responses to his subsequent requests for methadone. But in actuality, Chess presented no evidence that it did.

On the other side, defendants did not invoke the narcotics policy to defend their care. In her opening argument, defendants' counsel stressed the irrelevance of the narcotics policy, informing the jury that they would "hear a lot of testimony from all the defendants that the 'no narcotics' policy at High Desert really is irrelevant because all the evidence showed that [Chess] did not require a medication of that strength for his complaints of pain." Indeed, the only defendant who testified that he relied on the policy in treating Chess was Dr. Dial. But Dr. Dial saw Chess only once at the beginning of Chess's stay in the CTC, and the policy did not prevent Dr. Dial from giving Chess tapering-off doses of methadone. Six of the eight defendants were not asked about the policy and did not independently mention it in the course of defending their treatment decisions. Except for Dr. Dial, only Ms. Miller, who treated Chess both during and after his initial stay in the CTC, addressed the policy as it related to Chess's treatment. She specifically denied that she declined to prescribe the methadone because of the narcotics policy. She decided not to prescribe it "because [she] didn't think it was best for [Chess]."

On these facts, there is no reason to think that security concerns, or the narcotics policy born of those concerns, had anything to do with defendants' decision to withhold methadone while Chess was at HDSP. Therefore, it was error to issue the deference instruction.

### B. The *Wilson* Dicta

In authorizing the use of the deference instruction only in exceptional medical care cases, we reject defendants' argument that language in the Supreme Court's opinion in *Wilson v. Seiter*, 501 U.S. 294 (1991), compels us to extend the *Norwood* rule to all medical care cases. The *Wilson* Court was asked to decide whether a prisoner challenging his conditions of confinement had to prove that the defendants had a culpable state of mind, and if so, what that state of mind had to be. *Id*. at 296. The Court held that there was a subjective standard, and that it was the same standard the Court already applied to medical care cases. *Id*. at 303.

Defendants point to the following language from *Wilson* in support of their claim that medical care claims are a subset of conditions of confinement claims and that the two must be treated identically in jury instructions: "[T]he medical care a prisoner receives is just as much a 'condition' of his confinement as the food he is fed, the clothes he is issued, the temperature he is subjected to in his cell, and the protection he is afforded against other inmates." *Id*. The Court also said in a footnote, "It seems to us, however, that if an individual prisoner is deprived of needed medical treatment, that is a condition of *his* confinement, whether or not the deprivation is inflicted upon everyone else." *Id*. at 299 n.1.

Both sentences are dicta in the service of a different point than the one defendants seek to make. The first sentence was the Court's response to Wilson's argument that he need not make a showing as to the defendants' state of mind, and that the jury should decide whether the defendants' conduct was wanton solely by evaluating the effect of the conditions on Wilson. The Court rejected this argument because it had

already decided in *Whitley* that wantonness must be evaluated from the defendant's point of view. It was "[f]rom that standpoint" that the court saw "no significant distinction between claims alleging inadequate medical care and those alleging inadequate 'conditions of confinement'; both require prison officials to make decisions under constraints. *Id*. at 303.

The second sentence was addressed to the concurring justices, who argued that there was a legally relevant distinction to be drawn between "specific acts or omissions directed at individual prisoners" (which warranted a subjective inquiry) and systematic "conditions of confinement" that affected all prisoners (which did not). *Wilson*, 501 U.S. at 309 (White, J., concurring). The majority used the example of medical care to make the point that defendants' conduct, whether directed at one person or many people, should be evaluated against the same standard.

In both sentences, the Court in *Wilson* was drawing an analogy between medical care cases and conditions of confinement cases to explain why they should both have a subjective element and why the standard for conditions cases should be the same as that applied to medical care claims, rather than that applied to excessive force claims. As the Court wrote, "Whether one characterizes the treatment received by [the prisoner] as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard articulated in *Estelle*." *Id*. at 303 (majority opinion) (internal quotation marks omitted); *see Hudson v. McMillian*, 503 U.S. 1, 8 (1992) ("*Wilson* extended the deliberate indifference standard applied to Eighth

Amendment claims involving medical care to claims about conditions of confinement.").

Defendants' reading of the *Wilson* dicta proves too much. Prisons are total institutions in which prison personnel control all aspects of life. Everything an inmate experiences is, at a general level of abstraction, a condition of his confinement. This includes his access to the yard, the medical care he receives, and the force used to subdue him. *Cf. Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (The Eighth Amendment "also imposes duties on these [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984))). But we cannot treat claims relating to each of these conditions as if they are all indistinguishable conditions of confinement claims. The Supreme Court has told us as much: claims related to some facets of prison life, like the use of force, are subject to a different standard than others. That is the point of *Whitley* and *Wilson*, and it is a point we recently reconfirmed in *Harrington v. Scribner*, No. 09-16951, 2015 WL 2106387 at *5, *8 n.1 (9th Cir. May 7, 2015), in which we rejected the use of the *Norwood* instruction in a case brought by a prisoner alleging racial discrimination in violation of the Fourteenth Amendment, over an objection that such alleged discrimination constituted a condition of confinement.

## C. Harmless Error

Although we conclude that the jury instruction was error, we do not reverse the judgment because defendants have carried their burden of showing that "it is more probable than

not that the jury would have reached the same verdict had it been properly instructed." *Clem*, 566 F.3d at 1182 (internal citations and quotation marks omitted).

For the reason the instruction was erroneous, it was also harmless. As we explained above, the narcotics policy at HDSP did not catagorically prevent Chess from receiving methadone. Chess was eligible to receive methadone while he was in the CTC, where he was initially placed. If Chess's doctors thought he needed methadone at that time, they could have given it to him. If they thought he needed it after he joined the general population, they could have transferred him back to the CTC to receive it. We know the policy did not drive defendants' decision to deny him methadone because when they thought he needed narcotics, they gave them to him. Indeed, they prescribed him morphine at least twice.

All the defendants except Dr. Dial testified that they did not give Chess methadone because he did not need it. Dr. Dial said that Chess did not need it, and that it was dangerous. He also stated in a one-word answer that the prison policy forbade it outside the CTC. But the policy was irrelevant to Dr. Dial's treatment, for he treated Chess only in the CTC. Defendants consistently testified that methadone was not medically indicated for Chess's conditions and that none of the non-narcotic painkillers they prescribed him were harmful to his liver. Chess offered only his own non-expert opinion to counter defendants' medical opinions.

Defendants saw Chess frequently, ordered several diagnostic tests, repeatedly adjusted his medications, proposed surgical interventions, and were otherwise conscientious in their caregiving. Chess resisted them at

almost every turn, refusing to take the medication they prescribed him and delaying treatments that might have helped him. We are confident that the jury would have found for defendants even if it did not receive the deference instruction.

## Conclusion

We hold that the magistrate judge erred in this case in instructing the jury to defer to prison officials in the adoption and execution of policies and practices that in their judgment are needed to preserve discipline and to maintain internal security. This instruction is inappropriate in medical care cases brought by prisoners under § 1983, unless a party's presentation of the case draws a plausible connection between a security-based policy or practice and the challenged medical care decision. Neither party drew such a connection in this case. However, because this error was harmless, we affirm.

**AFFIRMED.**