**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LECIA L. SHORTER,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>LEROY D. BACA; GLORIA MOLINA;<br>MARK RIDLEY-THOMAS; DON KNABE;<br>MICHAEL D. ANTONOVICH; AVALOS,<br>Deputy Sheriff; ORTIZ, Deputy<br>Sheriff; County of Los Angeles;<br>DOES, 1 through 10 inclusive; ZEV<br>YAROSLAVSKY,<br>*Defendants-Appellees*. | No. 16-56051<br><br>D.C. No.<br>2:12-cv-07337-<br>JCG<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
Jay Gandhi, Magistrate Judge, Presiding

Argued and Submitted December 8, 2017
Pasadena, California

Filed July 16, 2018

Before: Kim McLane Wardlaw and Ronald M. Gould, Circuit Judges, and Yvonne Gonzalez Rogers,[*] District Judge.

Opinion by Judge Wardlaw

## SUMMARY[**]

### Prisoner Civil Rights

The panel vacated a partial grant of summary judgment, reversed the denial of a new trial, and remanded for further proceedings in a 42 U.S.C. § 1983 action brought by a pretrial detainee who alleged inadequate medical care, unconstitutional conditions of confinement, and humiliating and invasive strip searches.

The panel first noted that plaintiff presented uncontroverted evidence at trial that the County of Los Angeles, tasked with supervising high-observation housing for mentally ill women, has a policy of shackling the women to steel tables in the middle of an indoor recreation room as their sole form of recreation, and that jail officials routinely left noncompliant detainees naked and chained to their cell doors, for hours at a time without access to food, water, or a toilet.

---

[*] The Honorable Yvonne Gonzalez Rogers, United States District Judge for the Northern District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that given the evidence, the district court erred by instructing the jury to give deference to jail officials in deciding plaintiff's conditions of confinement and excessive search claims.  The panel noted that the only justification that the County offered at trial for severely restricting plaintiff's conditions of confinement was a concern about overcrowding and understaffing in the facility.  The panel held that if plaintiffs in § 1983 actions demonstrate that their conditions of confinement have been restricted solely because of overcrowding or understaffing, a deference instruction ordinarily should not be given. Rather, a deference instruction may be given only when there is evidence that the treatment to which the plaintiff objects was provided pursuant to a security-based policy. Similarly, if plaintiffs demonstrate that they have been subjected to search procedures that are an unnecessary, unjustified, or an exaggerated response to concerns about jail safety, deference to jail officials is unwarranted.

Addressing plaintiff's misclassification claim, the panel held that the magistrate judge abused his discretion by denying plaintiff's motion for a new trial on her claim that she was placed in a more restrictive unit without sufficient due process.

Finally, the panel vacated the district court's summary judgment as to plaintiff's inadequate medical care claim, and remanded for further proceedings in light of the recent opinion in *Gordon v. County of Orange*, 888 F.3d 1118 (9th Cir. 2018).  The panel noted that without the benefit of *Gordon*, the district court erroneously evaluated plaintiff's inadequate medical care claim under the Eighth Amendment's subjective deliberate indifference standard rather than the appropriate objective standard.

**COUNSEL**

William F. Abrams (argued) and David H. Kwasniewski, Steptoe & Johnson LLP, San Francisco, California, for Plaintiff-Appellant.

Rina M. Mathevosian (argued) and Henry Patrick Nelson, Nelson & Fulton, Los Angeles, California, for Defendants-Appellees.

**OPINION**

WARDLAW, Circuit Judge:

Lecia L. Shorter appeals the district court's partial grant of summary judgment in favor of the County of Los Angeles, Leroy Baca, Jacqueline Ortiz, and Alejandra Avalos (the County or County Defendants) on her 42 U.S.C. § 1983 inadequate medical care claim, and the denial of Shorter's motion for a new trial on her § 1983 claim based on her classification as mentally ill, her conditions of confinement, and the strip searches to which she was subjected as a pretrial detainee at the Century Regional Detention Facility (CRDF) in Lynwood, California.

At trial, Shorter presented uncontroverted evidence that the County, tasked with supervising high-observation housing for mentally ill women, has a policy of shackling the women to steel tables in the middle of an indoor recreation room as their sole form of recreation, and that jail officials routinely leave noncompliant detainees naked and chained to their cell doors, for hours at a time without access to food, water, or a toilet. Shorter also presented the jail's daily logs during her pretrial detention, which show that Shorter was deprived of meals, showers, and recreation due, in part, to

overcrowding and understaffing at CRDF. Shorter challenges the instructions given to the jury, which directed it to defer to the jail officials who enacted and carried out these policies and practices.

We have jurisdiction under 28 U.S.C. § 1291, and we vacate the partial grant of summary judgment, reverse the denial of a new trial, and remand for further proceedings.[1]

## I.

Shorter was a pretrial detainee at the County's CRDF, an all-women's jail in Lynwood, California, from November 15, 2011, to December 17, 2011. On the day she arrived at the jail, a social worker diagnosed Shorter with an unspecified mood disorder and placed Shorter in Module 2300, the jail's high-observation housing (HOH) unit for women who are mentally ill. HOH inmates wear yellow shirts and blue pants, and are subject to more restrictive conditions than inmates in other parts of CRDF. HOH inmates, for example, live in single-person cells and are monitored by jail staff every fifteen minutes to prevent suicide and other harmful behavior. HOH inmates are handcuffed whenever they leave their cells, with the exception of taking showers. In 2014, the U.S. Department of Justice (DOJ) commenced an investigation into the County jails' treatment of mentally ill inmates, and determined that the excessive use of shackles on the female inmates in HOH units was counterproductive to women's

---

[1] Shorter's motion to file supplemental excerpts of record (ECF No. 17) is **GRANTED**.  Baca et al.'s motion to strike Shorter's excerpts and opening brief (ECF No. 20) is **DENIED**.

physical and mental health, and led to violations of the detainees' constitutional rights.

After her release from CRDF, Shorter filed this 42 U.S.C. § 1983 action, pro se and in forma pauperis.[2] She challenges several conditions of her confinement in HOH and the procedures that the County used to classify her as mentally ill.

Shorter contends that the County's policy unreasonably allowed social workers to rely on a fifteen-question screening test, a cursory review of the inmate's record, and a brief interview, to make a practically unreviewable determination about how inmates are housed at CRDF. Shorter tried to appeal her mental health classification when she arrived at HOH, but jail officials did not provide her with the grievance forms that she could use to appeal her classification.

Shorter also claims that she was routinely denied recreation, meals, and showers as a pretrial detainee because of understaffing and overcrowding at CRDF. For recreation, deputies move the women to an indoor day room, where they leave the women with one arm restrained by a handcuff extended from a chain secured to the floor. The women sit individually at indoor steel tables and benches. Some watch television and others participate in group activities. Jail policy requires the women to remain handcuffed to the chain next to the table at all times, and HOH detainees do not have access to a gym or an outdoor recreation area. Shorter

---

[2] Shorter retained Steptoe & Johnson LLP as pro bono counsel through the Central District of California's Pro Bono Civil Rights Panel on October 6, 2014, after she successfully argued a number of discovery motions on her own behalf.

participated in two and half hours of this type of recreation during her thirty-two days in the jail. The jail's daily logs also show that on seven days of her confinement Shorter received less than three meals per day. And the same logs show that Shorter showered only three times, going six, seven, or eight days during her confinement without a shower, and instead relying on feminine pads for personal sanitation.

Shorter also challenges the jail's visual body cavity search policy, which all inmates are subjected to upon return from trips to court, and the jail's pervasive practice of leaving noncompliant detainees shackled to their cell doors. The search process begins with the detainee inside her cell, with both hands in handcuffs. The detainee then places her hands outside the chute of her cell, where the deputy, on the other side of the door, unlocks one of the handcuffs. Then, with one hand still handcuffed and attached to a chain outside of the door, the detainee removes her pants, socks, and shoes, as well as her shirt and bra, which remain attached to the chain extending from her handcuff. The detainee must then lift her breasts, lower her underwear, bend over, open her vagina and rectum, and cough. The County's official policy mandates that inmates shall not be required to "remain in any search position for more time than is reasonable and necessary to complete the search."

In practice, however, where the detainee failed to comply with the search procedures, it was common for deputies to leave the detainee chained to her cell door for hours at a time. Deputies Avalos and Ortiz testified that they were trained to leave noncompliant detainees who did not follow search procedures chained to their cell doors. Shorter testified that, on three occasions, deputies Avalos and Ortiz left her chained to her cell door for three to six hours, without access

to food, water, or clothing.  On one occasion, the deputies did not leave enough slack on Shorter's chain to allow her to reach the bathroom in her cell.  Shorter testified that there was only enough slack on the chain to allow her to sit on the floor and hold her hand up in the air.  Each time the deputies chained Shorter to her cell door, Shorter freed herself by manipulating her hand out of the restraints or by convincing another deputy to release the restraints.  Shorter said that these incidents made her feel like "an animal on display."[3]

Lastly, Shorter maintains that the County provided her with inadequate medical care.  Shorter has a blood condition that requires her to monitor her blood's thickness daily, and to take Coumadin, a prescription drug that prevents the blood from thickening too much.  Left untreated, the condition may cause blood clots, heart attack, stroke, or death.  Jail officials tested Shorter's blood once during her thirty-two day stay.  At the time of the test, officials determined that Shorter's blood was "dangerously thin," and they discontinued Shorter's Coumadin prescription.  Shorter was not tested again until after she left CRDF; at the time, doctors deemed her blood "dangerously thick."  Because jail officials did not routinely monitor her blood, Shorter worried that she was vulnerable to health risks throughout her pretrial detention.

---

[3] The jail did not develop an official policy for dealing with "uncooperative" inmates until 2012, and some testimony suggests that the jail no longer permits deputies to chain noncompliant inmates to their cell doors.  The jail's "Recalcitrant Inmate Policy" now instructs deputies to isolate the inmate, provide access to a toilet, and to notify a watch commander, who would document the incident, if the inmate fails to comply with procedures after an hour.  The jail has also started using a body scanner that renders the visual cavity search procedures unnecessary.

The County Defendants moved for summary judgment on all of Shorter's claims. They argued that Shorter could not establish policies, customs, or practices sufficient to establish a claim against the County or Sheriff Baca, in his official capacity, under *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978). They further maintained that Shorter's evidence did not raise a genuine dispute of fact that the County Defendants had violated Shorter's constitutional rights. Specifically, they argued that Shorter's conditions of confinement claims failed because there was no evidence that Shorter was deprived of recreation, food, or sanitation; that her inadequate medical care claim failed because Shorter could not show deliberate indifference to her medical needs; and that Shorter's excessive search claim failed because Shorter could not show that County officials used more than *de minimis* force. County Defendants also argued that Shorter had no constitutional right regarding her classification as "mentally ill" or any right to file a jailhouse grievance. Deputies Avalos and Ortiz moved for summary judgment on the ground of qualified immunity.

The district court granted partial summary judgment in favor of the County on Shorter's inadequate medical care claim, but it denied summary judgment on the remainder of the claims. The district court, construing the evidence in the light most favorable to Shorter, concluded that the deputies were not entitled to qualified immunity because their search practices violated law that was clearly established as of 2011—a decision that the deputies do not challenge here.

The case then proceeded to a jury trial before a magistrate judge. The magistrate judge, relying on Ninth Circuit Model Civil Jury Instructions, instructed the jury to "give deference to jail officials" in deciding Shorter's conditions of confinement and excessive search claims. The jury returned a verdict in favor of all defendants. Shorter then moved for a new trial, but the magistrate judge denied her motion. Shorter timely appeals.

## II.

The principal dispute on appeal is whether the magistrate judge erred by instructing the jury:

> In determining whether the defendant(s) violated the plaintiff's rights as alleged, you should give deference to jail officials in the adoption and execution of policies and practices that in their judgment are needed to preserve discipline and to maintain internal security.

We have come to refer to this instruction as the *Norwood* instruction, after our decision in *Norwood v. Vance*, 591 F.3d 1062 (9th Cir. 2010). The instruction is part of the Ninth Circuit model instructions for "Convicted Prisoner's Claim of Excessive Force," Ninth Cir. Model Civ. Jury Instr. § 9.26 (2017 ed.), and for "Convicted Prisoner's Claim re Conditions of Confinement/Medical Care," Ninth Cir. Model Civ. Jury Instr. § 9.27 (2017 ed.).[4] Because Shorter

---

[4] Although claims by pretrial detainees arise under the Fourteenth Amendment and claims by convicted prisoners arise under the Eighth Amendment, our cases do not distinguish among pretrial and post-conviction detainees for purposes of the excessive force, conditions of

challenges the resulting jury instruction as an incorrect statement of law, our review is de novo. *See Clem v. Lomeli*, 566 F.3d 1177, 1180–81 (9th Cir. 2009); *see also United States v. Warren*, 984 F.2d 325, 327 n.3 (9th Cir. 1993) ("Use of a model jury instruction does not preclude a finding of error.").

Defendants argue that Shorter failed to preserve her objection below, so our review should be for plain error. *See* Fed. R. Civ. P. 51(d)(2). But the record shows that Shorter objected to the deference instruction at trial, albeit on a different ground, and in a motion for new trial. An "objection need not be formal," and Shorter's objection was "sufficiently specific to bring into focus the precise nature of the alleged error." *Inv. Serv. Co. v. Allied Equities Corp.*, 519 F.2d 508, 510 (9th Cir. 1975); *see also Chess v. Dovey*, 790 F.3d 961, 970 (9th Cir. 2015) (describing the "pointless formality" exception to the objection requirement). As the magistrate judge recounted in his denial of Shorter's motion for a new trial, all parties were aware that the appropriateness of the jury instruction turned on whether the jail's recreation and extended search policies were necessary to preserve discipline and maintain internal security.

Shorter's constitutional claims "arise[] from the due process clause of the fourteenth amendment and not from the eighth amendment prohibition against cruel and unusual punishment." *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979)),

---

confinement, and medical care deference instructions. *See Bull v. City & Cty. of San Francisco*, 595 F.3d 964, 975 (9th Cir. 2015). The *Norwood* instruction is also part of the model instructions for "Convicted Prisoner's Claim of Failure to Protect," Ninth Cir. Model Civ. Jury Instr. § 9.28.

*overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc); *see also Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir. 1987) ("[T]he more protective fourteenth amendment standard applies to conditions of confinement when detainees . . . have not been convicted [of a crime.]").   While officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security," *Bell*, 441 U.S. at 547, that deference must be set aside where "the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security," *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 323 (2012).   "[I]n the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters." *Block v. Rutherford*, 468 U.S. 576, 584–85 (1984) (citation omitted).

However, our precedent should not be misread to suggest that jail officials are automatically entitled to deference instructions in conditions of confinement or excessive force cases brought by prisoners, or § 1983 actions brought by former inmates.   *Cf. Norwood*, 591 F.3d at 1067; *Chess*, 790 F.3d at 972–73; *see also Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1254 (9th Cir. 2016) (citing to *Norwood* and *Chess* for the rule that "in excessive force and conditions of confinement cases, we instruct juries to defer to prison officials' judgments in adopting and executing policies needed to preserve discipline and maintain security").   We have long recognized that a jury need not defer to prison officials where the plaintiff produces substantial evidence showing that the jail's policy or practice is an unnecessary,

unjustified, or exaggerated response to the need for prison security.[5] *See, e.g.*, *Florence*, 566 U.S. at 322–23; *Brown v. Plata*, 563 U.S. 493, 511 (2011); *Whitley v. Albers*, 475 U.S. 312, 322 (1986) (stating that deference to prison officials "does not insulate from review actions taken in bad faith and for no legitimate purpose"); *Spain v. Procunier*, 600 F.2d 189, 194 (9th Cir. 1979) ("Mechanical deference to the findings of state prison officials in the context of the eighth amendment would reduce that provision to a nullity in precisely the context where it is most necessary."). "[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary and purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees." *Bell*, 441 U.S. at 539.

As currently written, our circuit's model jury instructions for conditions of confinement and excessive force cases, which include a deference to jail officials instruction, are inconsistent with the model jury instructions for similar cases in the majority of other circuits with published pattern instructions, which generally do not include an additional deference instruction. *See, e.g.*, Third Cir. Model Civ. Jury Instr. §§ 4.10, 4.11 (2018 ed.); Eighth Cir. Manual of Model Civ. Jury Instrs. § 4.41 (2017 ed.); Eleventh Cir. Pattern Civ. Jury Instr. § 5.4 (2018 rev.). In *Chess*, we noted that our model jury instructions are "unique in including the deference language in Eighth Amendment

---

[5] In fact, we have recognized that, when conditions are dire, more judicial supervision, not less, may be warranted. *See Brown v. Plata*, 563 U.S. 493, 500 (2011) (describing procedures for appointing a three-judge panel that has the authority to order prisoners released under 18 U.S.C. § 3626(a)).

conditions of confinement cases."  790 F.3d at 972 n.1; *see also* 5 John S. Siffert, Modern Federal Jury Instructions–Civil ¶ 87.74D (Matthew Bender 2018) (describing jury instructions for all circuits).  And we pointed out that, except for language in a Fifth Circuit model instruction, *see* Fifth Cir. Model Civ. Jury Instr. § 10.7 (2014 ed.), and a model instruction proposed by a district judge on the First Circuit, "the deference language does not appear in any other circuit's model instructions for prisoner rights' claims." *Chess*, 790 F.3d at 972 n.1.  The Seventh Circuit's model instructions split the difference by omitting a deference instruction for conditions of confinement claims but including the instruction over the objection of "a significant minority of [the model jury instruction committee's] members" for excessive force claims.  Seventh Cir. Model Jury Instr. §§ 7.15, 7.18 & comm.(f) (2017 ed.).

We take this opportunity to clarify our precedent and align it with the practices of other circuit courts of appeal. We first must decide whether the magistrate judge erred in giving the deference instruction for Shorter's conditions of confinement claims, where the only justification that jail officials offered for curtailing Shorter's meals, showers, and recreation was a concern about overcrowding and understaffing in the facility.  We conclude that the deference instruction should ordinarily not be given in such circumstances.  Rather, we reiterate that the instruction may be given only when there is evidence that the treatment to which the plaintiff objects was provided pursuant to a security-based policy. *See Chess*, 790 F.3d at 964.  That was not the case here, and the magistrate judge should not have given the deference instruction as to those claims.

We next decide whether the magistrate judge erred in giving the deference instruction for Shorter's excessive

search claim, where jail officials concede that there was no legitimate penological purpose for shackling mentally ill, virtually unclothed, female pretrial detainees to their cell doors for hours at a time. We conclude that substantial record evidence supports Shorter's argument that this search practice was an unnecessary, unjustified, and exaggerated response to jail officials' need for prison security. We conclude that the magistrate judge erred in instructing the jury to give deference to the jail officials on this claim.

### A.

Shorter presented substantial evidence at trial showing that the jail's practice of chaining female inmates to a table in the middle of an indoor recreation room and depriving inmates of food and sanitation was an unnecessary and unjustified response to the problem of jail security. Among Shorter's most compelling evidence was a letter from both the Chief of the Special Litigation Section of the Civil Rights Division of the DOJ and the U.S. Attorney for the Central District of California, André Birotte, Jr.,[6] to the Los Angeles County Counsel, dated June 4, 2014. This letter expressed the DOJ's conclusion that the County's mental health care practices for the county jails violated pretrial detainees' Fourteenth Amendment rights. The letter condemned the County's practice of chaining detainees for recreation and concluded that "[t]his approach to prisoner management may be a reflection of the low level of security staffing throughout the women's housing units rather than a necessary safety-structural requirement for delivering appropriate assessment and treatment services." The DOJ encouraged the jail officials to make determinations about

---

[6] André Birotte, Jr. now serves as a United States District Judge for the Central District of California.

the appropriate level of restraint on "an individualized basis in accordance with the prisoners' specific mental health and safety needs."

The County admitted in testimony at trial that its policy denies HOH inmates access to physical exercise or any outdoor recreation, but it argues, on appeal, that its restrictive recreation policy is necessary because HOH inmates are "unpredictable," "violent," and "impulsive." The County did not offer any other reason or immediate need to so restrict the inmates' movement. The County also suggested that Shorter did not participate in recreation because she did not want to, but the County never explained why it needed to chain detainees at all times outside their cells, and particularly, during recreation. The only explanation offered came from deputy Ortiz, who testified that she, personally, would not permit detainees out of their cells if the facility was understaffed because she worried that recreation time or showers might escalate into violence, suggesting that the reason for the policy is not a legitimate penological one, but one based on overcrowding and understaffing.

A deference instruction was not warranted on these facts. Jail officials have a duty to ensure that detainees are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety. *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). And, we have confirmed, time and time again, that the Constitution requires jail officials to provide outdoor recreation opportunities, or otherwise meaningful recreation, to prison inmates. In *Pierce v. County of Orange*, for example, we concluded that inmates in administrative segregation, placed in segregation because of "violent tendencies that have been deemed a threat to the jail's staff or to other inmates," are nonetheless

constitutionally entitled to at least two hours per week of exercise. 526 F.3d 1190, 1208 (9th Cir. 2008). Even earlier, in *Spain v. Procunier*, we concluded that violent inmates in administrative segregation have a "right of outdoor exercise one hour per day, five days a week unless inclement weather, unusual circumstances, or disciplinary needs made that impossible." 600 F.2d at 199. At the time, we opined that there is "substantial agreement among the cases in this area that some form of regular outdoor exercise is extremely important to the psychological and physical well being of the inmates." *Id.* (collecting cases); *see also Thomas v. Ponder*, 611 F.3d 1144, 1152 (9th Cir. 2010) (opining that "case law uniformly stresses the vital importance of exercise for prisoners"); *Allen v. Sakai*, 48 F.3d 1082, 1088 (9th Cir. 1994), *as amended* (Nov. 1994); *Toussaint v. Yockey*, 722 F.2d 1490, 1492–93 (9th Cir. 1984).

Although we have acknowledged that "logistical problems," such as inadequate staffing and limited recreational facilities, may make it difficult for jail officials to provide adequate exercise to detainees, we have never condoned the wholesale, routine deprivation of meals and showers, or meaningful recreation activities, like those Shorter described, and the County confirmed, at trial. *See Allen*, 48 F.3d at 1088. "Logistical problems," without more, cannot justify serious civil rights violations such as "the deprivation of a basic human need." *Id.* at 1087. In *Allen v. Sakai*, for example, we recognized "that the practical difficulties that arise in administering a prison facility from time to time might justify an occasional and brief deprivation of an inmate's opportunity to exercise outside," but we did not accept the defendants' "excuse" that "scheduling an inmate's time in the exercise yard was difficult because, for security reasons, inmates had to be accompanied to the recreation yard by a guard and only one inmate could use the

recreation yard at a time." *Id.* at 1088.  And, in *Spain*, we concluded that "[t]he cost or inconvenience of providing adequate facilities is not a defense" to the imposition of punishment in violation of the Fourteenth Amendment.  600 F.2d at 200.

*Norwood*, where a deference instruction was warranted, is readily distinguishable.  There, officials at a maximum security prison decided to "lockdown" the facility four times over a two-year period to respond to inmate-on-inmate violence and a series of particularly violent attacks against correctional officers.  *Norwood*, 591 F.3d at 1065.  The lockdown meant that there was no outdoor recreation for inmates.  *Id.* at 1065–66.  Each time officials locked down the prison, however, the deprivation of recreation was time-limited, lasting from two to four and half months, and in response to specific incidents of threats, attempted batteries, and attempted murders of inmates and staff.  *Id.*

Unlike the prison officials in *Norwood*, who enacted the policy due to an unusual and highly volatile set of security-related concerns, *id.*, the County offers no specific reason for its shackling recreation policy or its practice of curtailing meals and showers when the facility is understaffed.  Nor does the County explain why it could not make the shackling determination on an individualized basis, as suggested by the DOJ in its 2014 letter, or why it believed that such restrictions were necessary at all times to protect inmate and officer safety.  *Cf. Doe v. Kelly*, 878 F.3d 710, 720 (9th Cir. 2017) (instructing jail officials to tailor conditions to particular features of a detention facility and the length of detention).  The policy was not adopted in response to an emergency or a dangerous situation that required jail officials to use their expertise to prevent further violence.  And, the County cannot justify its recreation policy by a

general statement that mentally ill detainees are "unpredictable" or "violent" and "impulsive," because many inmates, including those housed in administrative segregation as in *Pierce* and *Spain*, display antisocial behaviors and yet, we have concluded that *all* inmates are entitled to an individualized evaluation and recreation, barring inclement weather, unusual circumstances, or severe and imminent security risks. *See Spain*, 600 F.2d at 199.

The only justification that the County offered at trial for severely restricting Shorter's conditions of confinement was a concern about overcrowding and understaffing in the facility. We conclude that the deference instruction should ordinarily not be given when that is the County's sole justification. The magistrate judge therefore erred in instructing the jury to defer to jail officials in deciding Shorter's conditions of confinement claims.

## B.

Shorter also presented substantial evidence that showed that the jail's practice of chaining noncompliant detainees to their cell doors was an exaggerated response to jail officials' need for security and was not entitled to deference.

The Supreme Court most recently addressed the practice of strip searches at jails in *Florence v. Board of Chosen Freeholders*, 566 U.S. 318 (2012). *Florence* instructed courts to "defer to the judgment of correctional officials" when the officials conduct "strip searches" of detainees admitted to the general population of a jail facility. *Id.* at 322–23. At the Essex County jail, the facility in *Florence*, officials required all arriving detainees to pass through a metal detector and to wait in a group holding cell for a more thorough search. *Id.* at 324. When they left the holding cell, the detainee was instructed to remove his clothing while an

officer looked for body markings, wounds, and contraband. *Id.* The facility required the detainee to lift his genitals, turn around, and cough in a squatting position as part of the process. *Id.* After a mandatory shower, during which the detainee's clothing was inspected, officials admitted the detainee to the general population of the facility. *Id.* This search policy applied "regardless of the circumstances of the arrest, the suspected offense, or the detainee's behavior, demeanor, or criminal history." *Id.*

In concluding that jail officials were entitled to deference when they conducted such searches, the Court detailed the many reasons justifying the search. *Id.* at 330–34. It explained that it "may be difficult to identify and treat" contagious infections, wounds, or other injuries requiring immediate detention until detainees remove their clothes for a visual inspection. *Id.* at 330–31. The Court further reasoned that a visual inspection may be necessary to identify and isolate gang members, who often have tattoos and other signs of gang affiliation on their bodies. *Id.* at 331–32. And it acknowledged that jails need to detect contraband concealed by new detainees, pointing to briefs showing that officers had confronted arrestees concealing weapons, drugs, and other unauthorized items. *Id.* at 332. The Court opined that conducting an effective search may require a correctional official to require some detainees to lift their genitals and cough. *Id.* at 334. But the Court did not announce a general rule that applied to all searches. Two of the five Justices in the majority wrote separately to confirm that, while deference was appropriate on the facts in *Florence*, deference may not be appropriate for all searches. *Id.* at 340 (Roberts, C.J., concurring) ("The Court is [] wise to leave open the possibility of exceptions, to ensure that we 'not embarrass the future.'" (quoting *Nw. Airlines, Inc. v. Minnesota*, 322 U.S. 292, 300 (1944))); *id.* at 341 (Alito, J.,

concurring) ("It is important to note, however, that the Court does not hold that it is *always* reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population.").

Shorter challenges a search procedure that starts off in much the same way as the searches in *Florence*, but ends in a remarkably more punitive fashion for inmates who, from a deputy's perspective, do not comply with the procedures. The searches that Shorter challenges are distinguishable from *Florence*, both in their nature and in the lack of justification for the procedure. At the time that Shorter was detained, officials routinely left noncompliant female inmates shackled to their cell doors for hours, virtually unclothed, and without access to meals, water, or a toilet. These additional procedures distinguish what routinely occurred in the HOH units from what happened in the jails in *Florence*. When left shackled, the female inmates were visible to both the male and female guards on patrol. Moreover, unlike the search procedures in *Florence*, which occurred when detainees were admitted to the jail's general population from smaller group holding cells, the search here occurs any time the detainee returns from court, where the detainee has been shackled and monitored by prison guards at all times.

The search procedures here are a humiliating and extreme invasion of Shorter's privacy that must be justified by legitimate penological purposes. *See, e.g.*, *Way v. Cty. of Ventura*, 445 F.3d 1157, 1160 (9th Cir. 2006) ("The scope of the intrusion here is indisputedly a 'frightening and humiliating' invasion, even when conducted 'with all due courtesy.'" (quoting *Giles v. Ackerman*, 746 F.3d 614, 617 (9th Cir. 1984))); *Kirkpatrick v. City of Los Angeles*,

803 F.2d 485, 489–90 (9th Cir. 1986) ("[T]he fact that a strip search is conducted reasonably, without touching and outside the view of all persons other than the party performing the search, does not negate the fact that a strip search is a significant intrusion on the person searched."). But, at trial, jail officials admitted that their practice of keeping noncompliant detainees chained to their cell doors wearing only partial underwear did not serve any legitimate penological purpose.[7]  The CRDF watch commander testified that the only reason to chain a detainee to their cell door without clothing was to "get the clothing" from the detainee.  But once the officer searches the detainee's clothes, there was no reason to keep the detainee unclothed or chained.  The watch commander also testified that keeping an inmate chained to the cell door "shouldn't happen."  And a jail expert testified that there was no "penological practical reason for handcuffing an inmate to their cell door," given that the handcuffs were used to protect the officers from the inmate and the cell door already served this purpose, and that the practice was "too ripe for potential abuse."

That Los Angeles County jails no longer use the search procedure supports our conclusion that the search procedure was an exaggerated and unwarranted response to prison security.  The County has changed its policy regarding the procedure of chaining detainees to their cell doors, now limiting the maximum time that detainees may be chained to the door absent approval from a watch commander.  The County now also uses body scanners, which enable it to

---

[7] This is a separate question from whether the County's visual body cavity search policy was legitimately related to the jail's security interests.

avoid the visual cavity searches that were common when Shorter was a pretrial detainee.

Even at the time, the jail had an alternative, less abusive means of obtaining contraband from inmates. If a guard believed that an inmate had contraband, jail policy instructed the guard to isolate the inmate from other inmates, provide access to a toilet, turn off the water to the toilet, and line the toilet with plastic to trap any contraband as evidence. The deputies also could have sought out a mental health professional to talk to the detainee, or they could have reported the incident to the watch commander and documented it in the jail's recording system. Instead, the record shows that CRDF deputies routinely disregarded these policies in favor of the more commonly used method of chaining detainees, unclothed, to their cell doors.

In the past, where we have concluded that the methods used to conduct the search are unnecessary and unduly humiliating to the detainee, we have not deferred to correctional officials' search procedures. *See Byrd v. Maricopa Cty. Sheriff's Dep't*, 629 F.3d 1135, 1141–42 (9th Cir. 2011) (en banc), *cert denied*, 131 S. Ct. 2964 (2011). The facts presented in Shorter's appeal are not as similar to *Florence* as they are to *Byrd v. Maricopa County Sheriff's Department*, where our court, en banc, concluded that a cross-gender strip search of a pretrial detainee was an unreasonable incursion on the detainee's Fourth Amendment rights. *Id.* at 1142. We concluded that deference to jail officials was unwarranted when the methods used as part of the search were unreasonable. *Id.* at 1147. We confirmed that, "although valid reasons to search the inmates existed generally, there was no justification given for conducting a cross-gender strip search," particularly when the search was not necessitated by an

emergency and when other guards of the inmate's same gender were available to the conduct the search. *Id.* at 1143. "We readily acknowledge the deference due prison officials engaged in the admittedly difficult task of administering inmate populations. However, that deference does not extend to sanctioning a clear violation of an inmate's constitutional rights." *Id.* at 1147; *accord Michenfelder v. Sumner*, 860 F.2d 328, 332–33 (9th Cir. 1988) (confirming that searches that are "excessive, vindictive, harassing, or unrelated to any legitimate penological interest" violate the Fourth Amendment).

Nor have we concluded that deference is routinely warranted to prison officials in other contexts, including when the prison officials make decisions about a detainee's medical care. *Chess*, 790 F.3d at 973. In *Chess*, we concluded that the magistrate judge erred in giving the *Norwood* instruction for a § 1983 claim against a prison doctor who decided to withhold methadone to an inmate, rather than taper off the methadone while the inmate remained in a separate medical unit. *See id.* at 964, 973–75. And, in *Mendiola-Martinez*, we confirmed that there were genuine issues of disputed fact about whether a jail's decision to shackle a detainee during a C-section was an exaggerated response to a security threat, particularly where the woman did not give any indication that she would try to escape. 836 F.3d at 1255. These cases acknowledge that determinations about whether to defer to jail officials are often fact-intensive and context-dependent.

Here, where the County has not offered any reason why it needed to keep mentally ill inmates shackled and unclothed, without food, water, or access to a toilet for hours at a time, we conclude that the County's search practices were not entitled to deference as a matter of law. The County has since disavowed this past shackling practice, concluding that it is no longer justified, but this does not mean that Shorter is deprived of a forum to vindicate her civil rights and obtain damages, if appropriate. On these facts, the district court erroneously instructed the jury to defer to the judgment of jail officials.

## C.

These instructional errors were not harmless. An error in a jury instruction is harmless if defendants demonstrate that "it is more probable than not that the jury would have reached the same verdict had it been properly instructed." *Clem*, 566 F.3d at 1182. The defendants cannot make such a showing here. We have recognized that the *Norwood* instruction deals a "devastating blow" to the plaintiff's constitutional claims. *Harrington v. Scribner*, 785 F.3d 1299, 1307 (9th Cir. 2015). And it has been further suggested in a dissent that the instruction amounts to a "command to direct a verdict in favor of the government." *Norwood*, 591 F.3d at 1072 (Thomas, J., dissenting). Given the strength of Shorter's evidence that the jail's policies were not reasonably related to the jail's interest in securing inmates and staff, we conclude that giving these deference instructions was not harmless error.

## D.

We understand that we have, at times, left it to the jury to decide whether deference to jail officials is warranted where there is a genuine dispute of material fact over

whether the jail's policies or practices were unnecessary, unwarranted, or exaggerated. *See Mendiola-Martinez*, 836 F.3d at 1257. Because the County has not offered any legitimate, security-based reason for the shackling of all inmates during recreation, for curtailing inmate meals and showers, or for the shackling of noncompliant inmates in their cells after searches, there is no such dispute of fact here. The jail officials were not entitled to deference on this record.

## III.

Moving to Shorter's misclassification claim, we conclude that the magistrate judge abused his discretion by denying Shorter's motion for a new trial on her claim that she was placed in the more restrictive HOH unit without sufficient due process. Pretrial detainees have a right to procedural due process before they are subjected to more severe conditions of confinement than other detainees. *See Mitchell v. Dupnik*, 75 F.3d 517, 523 (9th Cir. 1986). Shorter presented evidence that jail officials did not provide her with grievance forms that she could use to challenge her mental health classification. Shorter also produced the DOJ letter, which confirmed that jail officials routinely did not complete mental health screenings and regularly failed to record the results of such screenings, when conducted, on the detainee's electronic medical record. Because the County came forward with no evidence that Shorter had received such grievance forms, the jury verdict was against the clear weight of the evidence. Shorter is entitled to a new trial on this issue as well.

## IV.

Turning finally to Shorter's inadequate medical care claim, we vacate and remand for further proceedings in light

of our recent opinion in *Gordon v. County of Orange*, 888 F.3d 1118 (9th Cir. 2018). In *Gordon*, we concluded that "claims for violations of the right to adequate medical care 'brought by pretrial detainees against individuals under the Fourteenth Amendment' must be evaluated under an objective deliberate indifference standard," and we set forth the elements of a medical care claim under the due process clause of the Fourteenth Amendment. *Id.* at 1124–25 (quoting *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016)). Not having the benefit of *Gordon*, the district court evaluated Shorter's inadequate medical care claim under the Eighth Amendment's subjective deliberate indifference standard. Because the pretrial grant of summary judgment was based on an erroneous legal standard, we vacate and remand the judgment in favor of County Defendants on Shorter's § 1983 inadequate medical care claim for further proceedings consistent with *Gordon.*

V.

In conclusion, we understand that, while courts "unquestionably should be reluctant to second-guess prison administrators' opinions about the need for security measures," *Block*, 468 U.S. at 593 (Blackmun, J., concurring), the judicial system has a role in safeguarding inmates from serious civil rights abuses, the kind that Shorter claims here. If plaintiffs in § 1983 actions demonstrate that their conditions of confinement have been restricted solely because of overcrowding or understaffing at the facility, a deference instruction ordinarily should not be given. Similarly, if plaintiffs in § 1983 actions demonstrate that they have been subjected to search procedures that are an unnecessary, unjustified, or exaggerated response to concerns about jail safety, we do not defer to jail officials. Otherwise, "careless invocations of 'deference' run the risk

of returning us to the passivity of several decades ago, when the then-prevailing barbarism and squalor of many prisons were met with a judicial blind eye and a 'hands off' approach." *Id.* at 594.

**REVERSED and REMANDED as to the denial of Shorter's motion for a new trial.**

**VACATED and REMANDED as to the partial grant of summary judgment in favor of County Defendants on Shorter's § 1983 claim for inadequate medical care.**